**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| **BRITISH AIRWAYS, PLC,** | ) | |
| **a foreign corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CASE NO.:** |
| **v.** | ) | |
| | ) | |
| **GROUND SERVICES INTERNATIONAL, INC.** | ) | |
| **d/b/a DNATA,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

-------------------------------------------------------------------- x

## COMPLAINT

Plaintiff BRITISH AIRWAYS, PLC, a foreign corporation ("British Airways"), by and through its counsel, Valentine Austriaco & Bueschel, P.C. and Condon & Forsyth LLP, hereby states its Complaint against Defendant GROUND SERVICES INTERNATIONAL, INC. d/b/a DNATA ("GSI") as follows:

## NATURE OF ACTION

1.     This is an action for breach of contract, indemnity, and contribution arising from the Standard Ground Handling Agreement ("SGHA") between British Airways and GSI, in which British Airways seeks full indemnification and damages from GSI, due to its breach of contract for failure to comply with procedures for safeguarding valuable cargo and failing to indemnify British Airways and any judgement or court award, and associated costs, fees (including but not limited to attorney fees), interest, and expenses.

2.     British Airways seeks indemnity and damages it sustained due to GSI's breaches of contract.  Specifically, during British Airways' transportation of valuable cargo, GSI failed to

1

follow procedures resulting in GSI employees being able to steal valuable cargo while servicing a British Airways flight at O'Hare International Airport ("ORD").

<b><u>THE PARTIES</u></b>

3.      British Airways is a foreign corporation duly organized and existing under the laws of the United Kingdom, with its principal office at Waterside, PO Box 365, Harmondsworth, United Kingdom.

4.      British Airways is engaged in the air transportation of passengers and cargo for hire to and from airports in the State of Illinois, including ORD.

5.      GSI is a for-profit corporation duly organized and existing under the laws of Michigan.

6.      Upon information and belief, GSI has a principal place of business located at 13495 Veterans Way, Suite 500, Orlando, Florida 32827.

7.      Upon information and belief, GSI has a principal place of business located at 12124 High Tech Avenue, Suite 200, Orlando, Florida 32817.

8.      GSI's registered agent in the State of Illinois is Incorp Services, Inc., 901 S 2nd Street, Suite 201, Springfield, Illinois 62704-7909.

9.      GSI provides ground handling services for several airlines in Chicago, Illinois, including British Airways at ORD.

<b><u>JURISDICTION AND VENUE</u></b>

10.     This Court has subject matter jurisdiction over this matter based on 28 U.S. Code § 1332, because there is complete diversity of citizenship and the value of the matter in controversy exceeds $75,000.

11.     This Court has personal jurisdiction over GSI because it transacts business, is registered to do business, and continuously performs ground handling services at ORD in Chicago, Illinois.  Further, the tortious conduct and breaches of contract which give rise to this litigation arise from and relate to GSI's forum-related activities at ORD within Chicago, Illinois.

12.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C.§ 1391(b) because a substantial part of the acts and omissions giving rise to British Airways' claims occurred in this District and GSI transacts business and performs ground handling services in Chicago, Illinois.

**FACTUAL BACKGROUND**

13.     British Airways repeats, reiterates, and realleges the allegations in Paragraphs 1 through 12 of this Complaint as if fully set forth herein.

14.     On or about July 6, 2021, British Airways and GSI entered into the SGHA, which was in effect in July 2023, the substance of which is reflected in **Exhibit A**.

15.     Pursuant to the SGHA, British Airways contracted with GSI to provide, amongst other things, ground handling services for British Airways at ORD, which included ground handling services of valuable cargo and to follow associated procedures for the handling of valuable cargo.

16.     On or about July 17, 2023, British Airways contracted with Al-Arefi Jewelry ("Al-Arefi") to carry a consignment of 8.37 kilograms of gold jewelry ("the Shipment"), that was to be carried as a "Valuable" freight product, from Bahrain International Airport ("BAH") to Chicago O'Hare International Airport ("ORD") via London Heathrow Airport ("LHR") under Air Waybill 125-5432 4675 (the "AWB").

17.     On July 18, 2023, the Shipment was loaded onto British Airways flight BA124 from BAH to LHR and then transported to ORD on British Airways flight BA297 the same day.

18.     Al-Arefi made a special declaration of interest for the Shipment, as the AWB stated "VAL CARGO."

19.     In or about July 2023, GSI provided said ground handling services pursuant to the SGHA to British Airways at ORD for British Airways flight BA297.

20.     The Shipment was reported missing from the aircraft after it arrived at ORD on July 18, 2023.

21.     After an investigation was conducted, two GSI employees were arrested, arraigned, and prosecuted in Illinois Court for stealing the jewelry from the British Airways flight BA297 during the offloading of the aircraft when it arrived at ORD on July 18, 2023. .

22.     Due to the stolen Shipment, Al-Arefi brought an action against British Airways and Al Mulla Logistics for the loss of the Shipment in a Bahraini Court, under Case Number 5/17883/2023/02.

23.     On December 22, 2023, British Airways sent a letter to John David Barker at GSI requesting indemnification for the action started by Al-Arefi and any potential judgment obtained by Al-Arefi against British Airways in the Bahraini Court.

24.     On January 8, 2024, GSI breached the SGHA by failing to indemnify British Airways for any potential judgement arising from GSI's breaches of contract, and continues to refuse to indemnify British Airways, necessitating this Action.

25.     The Bahraini Court issued a judgment on February 4, 2024, ordering British Airways to pay BHD 153,000 (approximately USD 406,000).

## CLAIMS FOR RELIEF

## COUNT I – BREACH OF CONTRACT

26.     British Airways repeats, reiterates, and realleges the allegations in Paragraphs 1 through 25 of this Complaint as if fully set forth herein.

27.     The SGHA was in effect in and around July 2023.

28.     Pursuant to the SGHA, GSI agreed to follow British Airways' procedures, protocols, and guidelines, including British Airways' Standard Operating Procedures for Valuable Cargo, which include the safe and competent provision of ground handling services to be performed without risk of theft, particularly by its own employees.

29.     GSI's failure to follow British Airways procedures, protocols, and guidelines in its performance of its ground handling services for British Airways is a breach of contract and a negligent act under of the SGHA.

30.     Due to GSI's breach and negligent act, GSI is required to indemnify British Airways for any claims and damages arising from the loss of valuable cargo.

31.     The refusal of GSI to indemnify British Airways for the loss and theft of the Shipment constitutes a second breach of the SGHA.

32.     The SGHA requires GSI to defend and indemnify British Airways for any and all damages caused by the negligence of GSI's employees in the provision of services under the SGHA.

33.     GSI has failed to provide British Airways with full indemnification for the damages caused by GSI's own negligence.

34. GSI's breach of contract resulted in direct and consequential damage to British Airways for which GSI is liable, including, but not limited to:

   a. Costs of defending the action brought by Al-Arefi in Bahraini Court;

   b. Costs of the judgment entered against British Airways in favor of Al- Arefi;

   c. Attorneys' fees and expenses incurred, in excess of $100,000.00, in seeking indemnification from July 2023 to present;

   d. Loss of business reputation and goodwill;

   e. Additional direct and consequential losses, in excess of $700,000, that have not yet been evaluated.

## COUNT II – INDEMNIFICATION

35. British Airways repeats, reiterates, and realleges the allegations in Paragraphs 1 through 34 of this Complaint as if fully set forth herein.

36. Pursuant to the SGHA, GSI is required to defend and indemnify British Airways for any and all damages caused by its negligent acts of its employees and agents providing services to British Airways under the SGHA.

37. The SGHA was in full force and effect in July 2023 and British Airways had not breached the SGHA.

38. The ground handling services GSI performed for the British Airways Aircraft in July 2023 were encompassed by the SGHA.

39. Pursuant to the SGHA, GSI is obligated to indemnify British Airways for the full amount of its damages resulting from GSI's employees' negligent acts.

40. British Airways provided timely written notice of its indemnity claim to GSI.

41. GSI has wrongfully refused to indemnify British Airways for the damages incurred due to the stolen and lost Shipment caused by GSI's negligent acts.

42.     GSI's failure to indemnify British Airways resulted in direct and consequential damage to British Airways for which GSI is liable, including, but not limited to:

   a.   The value of the judgement and interest awarded to Al-Arefi and associated defense costs;

   b.   Attorneys' fees and expenses incurred, in excess of $100,000.00, in seeking indemnification, from December 2023 to present;

   c.   Additional direct and consequential losses, in excess of $700,000, that have not yet been evaluated.

## COUNT III – CONTRIBUTION

43.     British Airways repeats, reiterates, and realleges the allegations in Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

44.     It is alleged that Al-Arefi, sustained damages as a result of the aforementioned negligent acts of GSI, allegedly due to the negligence of Plaintiff, British Airways, as alleged by Al-Arefi, with Plaintiff, British Airways denying all such allegations.

45.     That if Al-Arefi, was caused to sustain injuries at the time and place, and in the manner alleged in the Complaint in the Bahraini Court, through any carelessness, recklessness, and negligence, or contributory negligence, then any such injuries or damages were caused by the carelessness, recklessness, and negligence of GSI, its agents, servant, and/or employees and consequently, GSI is responsible in whole or in part for such damages.

46.     That by reason of the foregoing, GSI will be liable to Plaintiff, British Airways, in that event and in the full amount of recovery herein by Al-Arefi, or for that proportion thereof caused by the relative responsibility of GSI, and that GSI is bound to pay any and all attorneys' fees, costs of investigations, and disbursements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff BRITISH AIRWAYS, PLC prays for judgment in its favor and against Defendant GROUND SERVICES INTERNATIONAL, INC. d/b/a DNATA, in excess of $700,000.00, and ordering indemnification for its direct and consequential losses incurred due to GSI's breach of contract, as a result of the July 2023 Shipment theft, as well as costs, attorney's fees, prejudgment interest, and any other relief which the Court deems just and proper.

Dated: October 30, 2024

Respectfully submitted,

**BRITISH AIRWAYS, PLC**

By: */s/ Anthony U. Battista*
 On of Its Attorneys

Anthony U. Battista, Esq.
James DiMaggio, Esq. (*pro hac vice* forthcoming)
CONDON & FORSYTH LLP
7 Times Square
New York, New York 10036
Telephone: 212-490-9100
Email: abattista@condonlaw.com
Email: jdimaggio@condonlaw.com

 -and-
Susan Valentine (ARDC No.6196269
Erica Byrd (ARDC No. 6296014)
VALENTINE AUSTRIACO & BUESCHEL, P.C.
300 E. Randolph Street, Suite 3400
Chicago, Illinois 60601
Telephone: 312-288-8285
Email: svalentine@vablawfirm.com
Email: ebyrd@vablawfirm.com

*Attorneys for Plaintiff*

8

# EXHIBIT A

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

Standard Ground Handling Agreement
Simplified Procedure
Annex B1.0 - Location(s), Agreed Services and Charges

---

### STANDARD GROUND HANDLING AGREEMENT
### SIMPLIFIED PROCEDURE

**Annex B 1.1 - Location(s), Agreed Services and Charges**

to the Standard Ground Handling Agreement (SGHA) of January 2013

---

| | |
|---|---|
| between: | **British Airways Plc** |
| having its principal office at: | **PO Box 365** |
| | **Waterside** |
| | **Harmondsworth** |
| | **UB7 0GB** |
| | **United Kingdom** |

herein after referred to as "the Carrier"

| | |
|---|---|
| and: | **Ground Services International, Inc, dba Dnata** |

herein after referred to as "the Handling Company"

| | |
|---|---|
| having its principal office at: | **12124 High Tech Ave STE 200** |
| | **Orlando, FL 32817** |

the Carrier and/or the Handling Company may hereinafter be referred to as "the Party(ies)"

| | |
|---|---|
| This Annex B for the location(s) "Location": | **Chicago O'Hare International Airport (ORD)** |
| is valid from: | **1st February 2021** |

hereinafter referred to as the "Effective Date"

| | |
|---|---|
| and replaces: | **Annex B1.0 dated 30th June 2015 and any subsequent addendums** |

---

### PREAMBLE

This Annex B (which includes any appendices, schedules and other attachments hereto) is prepared in accordance with the simplified procedure whereby the Parties agree that the terms of the Main Agreement and Annex A of the SGHA of January 2013 as published by the International Air Transport Association (hereinafter referred to as the **"Main Agreement"**) shall apply to this Annex B as if such terms were repeated here in full. By signing this Annex B, the Parties confirm that they are familiar with the aforementioned Main Agreement and Annex A and that the agreement between them comprises the Main Agreement, Annex A and this Annex B (hereinafter referred to as the **"Agreement"**).  If any part of this Annex B is inconsistent with or conflicts with the provisions of the Main Agreement, this Annex B shall prevail to the extent of any conflict.

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

## PARAGRAPH 1.       HANDLING SERVICES AND CHARGES

1.1       For a single ground handling consisting of the arrival and the subsequent departure of the same aircraft, the Handling Company shall provide the following services of Annex A (hereinafter referred to as **"the Services"**) at the rate(s) specified in Sub-Paragraph 1.2 (unless otherwise stated) and in accordance with the service levels specified in Appendix 1 (hereinafter referred to as the **"Service Level Agreement"**):

## SECTION 1 - MANAGEMENT FUNCTIONS

| | |
|---|---|
| **1.1** | **Representation** |
| 1.1.2 | Liaise with local authorities. |
| 1.1.3 | Indicate that the Handling Company is acting as handling agent for the Carrier. |
| 1.1.4 | Inform all interested Parties concerning schedules of the Carrier's aircraft. |

| | |
|---|---|
| **1.2** | **Administrative Functions** |
| 1.2.1 | Establish and maintain local procedures. |
| 1.2.3 | Prepare, forward, file and retain for a period specified in Annex B, messages/reports/statistics/documents and perform other administrative duties in the following areas (including but not limited to filing of relevant documentation relating to each flight in accordance with the Carrier's requirements and as mutually agreed between both Parties): |
| | (a) station administration |
| | (c) ramp services |
| | (g) mail services |
| | (h) support services |
| 1.2.4 | Maintain the Carrier's manuals, circulars, and other operational documents connected with the performance of the services. |
| 1.2.5 | (c) Forward |
| | on behalf of the Carrier items including, but not limited to, invoices, supply orders, handling charge notes, work orders. |

| | |
|---|---|
| **1.3** | **Supervision and/or Co-ordination** |
| 1.3.1 | (b) Co-ordinate |
| | services contracted by the Carrier with third party(ies). |
| 1.3.3 | Ensure that the third party(ies) is (are) informed about operational data and Carrier's requirements in a timely manner. |
| 1.3.4 | Liaise with the Carrier's designated representative (including but not limited to immediately informing the Carrier's local representative of any safety or security related incident affecting the Carrier's operations). |
| 1.3.5 | Verify the availability and preparedness of staff, equipment, Loads, documentation of third party(ies) to perform the services. |
| 1.3.6 | Meet aircraft upon arrival and liaise with crew. |
| 1.3.8 | Verify despatch of operational messages. |
| 1.3.9 | Note irregularities and inform the Carrier. |

## SECTION 3 - RAMP SERVICES

| | |
|---|---|
| **3.1** | **Baggage Handling** |
| 3.1.1 | Handle baggage in |
| | (1) baggage sorting area |
| 3.1.2 | Prepare for delivery onto flights |
| | (a) bulk baggage |
| | (b) ULDs |
| | (c) baggage accepted at departure gate |
| 3.1.3 | Establish the number and/or weight (notional) of the below and provide the load control unit with the information |
| | (a) bulk baggage |

|        |                                                                                      |
|--------|--------------------------------------------------------------------------------------|
|        | (b) built-up ULDs                                                                    |
| 3.1.4  | Offload                                                                               |
|        | (a) bulk baggage                                                                     |
|        | (b) ULDs                                                                             |
| 3.1.5  | Prioritise baggage delivery to claim area                                            |
| 3.1.6  | Deliver to claim area                                                                |
|        | (a) baggage                                                                          |
|        | (b) out of gauge (OOG)                                                               |
| 3.1.7  | Transfer baggage                                                                     |
|        | (a) Provide                                                                          |
|        | (1) sortation of transfer baggage.                                                   |
|        | (2) storage of transfer baggage prior to despatch (storage time limits to be specified in Annex B (If applicable) |
|        | (3) transport of transfer baggage to the sorting area of the receiving carrier.      |
| 3.1.8  | Handle crew baggage                                                                  |

**3.2** **Marshalling**
3.2.1     (a) Provide
           marshalling at arrival and/or departure.
3.2.2     Operate automated guidance systems

**3.3** **Parking**
3.3.1     (a) Provide
           (b) Position and/or remove
           wheel chocks.
3.3.2     (a) Provide
           (b) Position and/or remove
           (6) safety cones.

**3.4** **Ancillary Items**
3.4.1     (a) Provide
           (c) Operate
           (1) ground power unit
           (3) cooling unit
           (4) heating unit
           (5) air start unit

**3.5** **Ramp to Flight Deck Communication**
3.5.1     Provide headsets
3.5.2     Perform ramp to flight deck communication
           (a) during push-back
           (b) during tow-in
           (c) during engine starting
           (d) for other purposes

**3.6** **Loading and Unloading**
3.6.1     (a) Provide
           (c) Operate
           (1) passenger steps
3.6.2     (b) Arrange for
           (1) passenger
           (2) crew transport

|       | between the aircraft and terminal(s) |
|-------|--------------------------------------|
| 3.6.3 | (a) Provide |
|       | (c) Operate |
|       | equipment for loading and/or unloading |
| 3.6.4 | (a) Provide |
|       | delivery and pick-up of |
|       | (1) baggage |
|       | (2) mobility devices at aircraft doors or other agreed points |
| 3.6.5 | (a) Provide |
|       | assembly and transport of (In accordance with the Carrier's Line haul SLA as attached as Appendix 5 to this Annex B) |
|       | (1) baggage |
|       | (2) general cargo |
|       | (3) special shipments |
|       | (4) mail (between agreed points on the airport and/or off airport) |
|       | (6) company mail between agreed points on the airport |
| 3.6.6 | (a) Unload aircraft, returning lashing material to the Carrier |
|       | (b) Load and secure Loads in the aircraft |
|       | (c) Redistribute Loads in the aircraft (sign LIR as per Carrier's instructions) |
|       | (d) Operate in-plane loading system |
|       | (e) Report final load distribution to the Load Control unit. |
| 3.6.7 | Open, close and secure aircraft hold doors |
|       | (a) aircraft lower deck |
| 3.6.9 | (a) Provide |
|       | safeguarding of all Loads requiring special handling during |
|       | (1) loading/unloading |
|       | (2) transport between aircraft and designated point on the airport |

| **3.7** | **Safety Measures** |
|---------|---------------------|
| 3.7.1 | (a) Provide |
|       | (1) portable fire extinguisher on motorised/self-propelled ramp equipment |
|       | (2) ramp fire extinguisher, if not provided by airport authority |
|       | (b) Arrange for |
|       | (1) attendance of airport fire services at aircraft |
| 3.7.2 | Perform visual external safety/ground damage inspection of |
|       | (a) doors and panels and immediate surroundings |
|       | (b) other inspection items as specified in Annex B (visual inspection as stated in the Carrier's manuals) |
|       | (1) immediately upon arrival |
|       | (2) immediately prior to departure and communicate the results to flight crew or Carrier's representative (including any obvious and noticeable damage to any part of the aircraft fuselage, doors, panels, wings, engines, tail, horizontal stabilisers, undercarriage, wheels or control surfaces) |
| 3.7.3 | Check that all doors and access panels are properly closed and locked. |

| **3.8** | **Moving of aircraft** |
|---------|------------------------|
| 3.8.1 | (a) Provide |
|       | (1) tow-in and/or push-back of aircraft (one push included in the handling rate; Handling Company must record the use of a towbar-less tractor (TBL) in accordance with the Carrier's operating instructions) |
|       | (2) towing of aircraft between points (As approved by British Airways) |
|       | (4) wing-walker(s) |
| 3.8.2 | (b) Towbar to be provided by the Handling Company |

| **3.10** | **Interior Cleaning** (In accordance with the Carrier's cleaning specification as attached as Appendix 4 & 4A to this Annex B, and in accordance with the US Secure Clean as appropriate) |
|----------|---|

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

| | |
|---|---|
| **3.11** | **Toilet Service** |
| 3.11.1 | (a) Provide |
| | (1) servicing (empty, clean, flush, replenish fluids) |
| | (2) Triturator/disposal service |
| | |
| **3.12** | **Water Service** |
| 3.12.1 | (a) Provide |
| | (1) draining tanks |
| | (2) replenish tanks (water standard as specified in Annex B) |
| | (3) water quality tests (of Ground Handler equipment only) |

## SECTION 4 - LOAD CONTROL AND FLIGHT OPERATIONS

| | |
|---|---|
| **4.1** | **Load control** |
| 4.1.1 | Deliver load control related documents between aircraft and airport buildings and vice versa. |
| 4.1.2 | (a) Process |
| | (b) Sign |
| | documents and information, including but not limited to, loading instructions, load and trim sheets, Captain's load information and manifests where: |
| 4.1.2 | (2) Handling Company is performing inputs/updates when Load Control is performed by the Carrier or third party. |
| | |
| **4.3** | **Flight Operations** |
| 4.3.1 | Inform the Carrier of any known project affecting the operational services and facilities made available to its aircraft in the areas of responsibility as specified in Annex B. |
| | (a) Provide |
| 4.3.3 | Delivery of flight operations related documentation to the aircraft and obtain signature of the pilot-in-command, where applicable |
| | (1)At the airport location as defined in Annex B |

## SECTION 6 - SUPPORT SERVICES

| | |
|---|---|
| **6.2** | **Automation/Computer Systems** |
| 6.2.1 | (b) Arrange for |
| | (c) Operate |
| | computer hardware and other equipment (as specified in Annex B) to enable access to |
| | (1) Carrier's system |
| 6.2.2 | (a) Perform the following functions in the Carrier's system |
| | (1) training |
| | (4) baggage reconciliation |
| | (5) baggage tracing |
| | (6) operations, load control |
| | |
| **6.3** | **Unit Load Device (ULD) Control** |
| 6.3.1 | (b) Arrange |
| | storage space for |
| | (1) passenger ULDS (for one turn operation per scheduled flight additional ULD's will be charged as per Airport Authority fees structure). |
| 6.3.2 | Take action to prevent damage, theft or unauthorised use of the Carrier's ULDs in the custody of the Handling Company.  Notify the Carrier immediately of any damage or loss. |
| 6.3.3 | (a) Take physical inventory of ULD stock and maintain records (ensuring ULD levels are correctly maintained on station in accordance with Carrier's instructions) |
| | (b) Compile and despatch ULD control messages |

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

| | |
|---|---|
| 6.3.4 | Prepare ULD exchange control documentation for all transfers of ULDs and obtain signature(s) of the transferring and receiving carrier(s) or approved third parties and distribute copies. |
| 6.3.5 | Handle lost, found and damaged ULDs and notify the Carrier of such irregularities |

**6.6**        **Surface Transport (On Request)**

6.6.1       (b) Arrange for (on request with cost to be paid by the Carrier)

the transport of

(1) passengers

(2) baggage

(5) empty ULDs

(6) other between

(ii) airport and other agreed points


## SECTION 7 - SECURITY

**7.1**       **Passenger and Baggage Screening and Reconciliation**

7.1.4       (a) Provide

(4) offloading of baggage for passengers who fail to board the aircraft

7.4.2       (a) Provide

(b) Arrange for

Searching of

(i) aircraft (in accordance with US Secure Clean)

(ii) designated areas (in accordance with US Secure Clean)


**7.5**       **Additional Security Services**

7.5.1       (b) Arrange for

Additional security services (on request and at additional cost)


1.2       The charges for all the services listed in Sub-Paragraph 1.1 above are as set out in the relevant table included in Appendix 2. These rates are for the ground handling consisting of the arrival and the subsequent departure of the same aircraft.

1.3       Subject to Sub-Paragraph 1.6 below, handling in case of i) technical landing, (ii) for other than commercial purposes and/or (iii) fuel and go, will be charged at 25% of the applicable turnaround rate, provided that a physical change of load is not involved.

1.4       Subject to Sub-Paragraph 1.6 below, handling in case of return to ramp will not be charged extra, provided that a physical change of load is not involved.

1.5       Subject to Sub-Paragraph 1.6 below, handling in case of return to ramp involving a physical change of load will be charged at 50% of the applicable turnaround rate specified in Sub-Paragraph 1.2 of this Annex.

1.6       The charges referred to in Sub-Paragraph 1.3, 1.4 and 1.5 shall not apply where the relevant occurrence was caused by the Handling Company.

1.7       The Handling Company shall not charge the Carrier for cancelled flights, provided that the Carrier has given notice (by such means as is agreed in writing by the Parties from time to time, for example by email exchange between operational representatives) of such cancellation twelve (12) hours or more prior to the scheduled departure time. In the event that the Carrier gives less than twelve (12) hours' notice, the following charges shall apply:

      1.7.1     Less than twelve (12) hours' notice and nine (9) hours or more notice, then the charge shall be 50% of the applicable rate; or

      1.7.2     Less than nine (9) hours' notice and six (6) hours or more notice, then the charge shall be 75% of the applicable rate; or

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

    1.7.3    Less than six (6) hours' notice, then the charge shall be 100% of the applicable rate.

1.8    Handling in the case of ferry flights will be charged as follows:

    1.8.1    50% of the applicable rate for live in / ferry out flights.

    1.8.2    75% of the applicable rate for ferry in / live out flights.

1.9    Notwithstanding Sub-Paragraph 5.1 and 5.3 of this Agreement the Carrier shall be liable for an additional charge in the event of the following: i) that the Carrier's off schedule operation is in excess of 60 (sixty) minutes after the scheduled departure time or scheduled arrival time; ii) that any delay is not attributable to the Handling Company, and iii) that the Handling Company is required to pay overtime (i.e. employee exceeding normal rostered hours) to handle the Carrier's flight.

In such circumstances the additional charge will be:

1.    calculated such that an allowance of 60 (sixty) minutes after the scheduled time of departure or arrival is made;
2.    at the rates per hour specified in Appendix 2 below (including minimum period as specified); and
3.    notified (the number of hours) to the Carrier's designated representative;

provided always that the Handling Company will use best endeavours to minimise such costs for the Carrier.

1.10    For services on aircraft types not specified in Sub-Paragraph 1.2 above, a rate proportional to the size of such aircraft types shall be mutually agreed in advance.

1.11    Notwithstanding Article 3, Sub-Article 3.2 of the Main Agreement or any other provision to the contrary, the Carrier shall be entitled to appoint any other company, person or organisation to provide the Services without the agreement of the Handling Company where there has been a breach of contract or force majeure event in respect of this Agreement or the Services.

1.12    Subject to Sub-Paragraph 1.3, which sets out the charges for certain defined events, in the event of an unscheduled aircraft diversion, the Carrier shall be charged for the actual services performed according to the published tariff by the Handling Company at the time of handling and the total cost of all services performed shall not exceed the charge rates listed herein for the aircraft type. The Handling Company shall be required to evidence the actual services performed in the handling of an unscheduled aircraft diversion to the sole satisfaction of the Carrier.

1.13    Intentionally Not Used.

1.14    The terms contained within this Agreement shall be available to the Carrier's franchises, subsidiaries (including subsidiaries of the Carrier's parent company), alliances and merged partners subject to them requiring analogous specifications including but not limited to the Carrier's published schedule, operating instructions and manuals and subject to similar circumstances which may have an impact on the Handling Company's pricing. Price adjustments shall be negotiated where specifications differ to take into account such differences.

## PARAGRAPH 2.    ADDITIONAL SERVICES AND CHARGES

2.1    All services and equipment not specifically listed elsewhere in this Annex B are not included in the turnaround charge and will be charged for as set out in the relevant table included in Appendix 2.

2.2    All additional services not included in Paragraph 1 or Sub-Paragraph 2.1 will be charged for at local rates according to the tariff published by the Handling Company at the time of handling.

## PARAGRAPH 3.    TIMELINESS

3.1    The Handling Company shall work to the Carrier's Precision Timing Schedules (PTS) (or equivalent) as provided by the Carrier, which may be amended from time to time. The Handling Company agrees that for any services provided, time shall be of the essence.

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

3.2     Notwithstanding Sub-Articles 1.3 and 1.5 of the Main Agreement, the Handling Company shall use its best endeavours to ensure that, regardless of the time of the arrival of the aircraft, the Services shall be completed such that the departure schedule is maintained.

## PARAGRAPH 4.          STANDARD OF WORK

4.1     Notwithstanding Article 5, Sub-Article 5.2 of the Main Agreement and any other provision to the contrary, the Handling Company shall carry out all Services in accordance with the Carrier's operating instructions.

4.2     The Carrier shall provide all manuals and amendments specific to its needs e.g. IATA manuals, SOPs Ground Operations Manuals, Cargo manuals.  The Handling Company shall ensure it is operating to the most up-to-date versions of the documentation provided by the Carrier.

4.3     The Handling Company will obtain and keep in force, and comply with the terms and conditions of, all permits, licences, authorisations, rights and permissions necessary for its lawful performance of its obligations under this Agreement.

4.4     The Handling Company shall at all times comply with all applicable ICAO, EASA, FAA regulations, IATA standards and all other applicable local or international laws, rules, standards and regulations, as well as any relevant guidelines published by a regulatory authority, necessary for its lawful performance of its obligations under this Agreement. In particular, in the event that the Services include the requirement for the Handling Company to scan baggage, then the Handling Company shall ensure that it maintains compliance with IATA Resolution 753 where applicable.

4.5     The Handling Company will notify the Carrier promptly of (i) any suspension, revocation, cancellation or termination of any permit, licence, authorisation, right or permission necessary for its lawful performance of its obligations under this Agreement; or (ii) any incident which may jeopardise the Handling Company's continued compliance with the Agreement or of any order, notice or complaint issued by any governmental or quasi-governmental authority against the Handling Company.

4.6     In addition to Sub-Article 5.1 of the Main Agreement, the Handling Company and, if applicable, its sub-contractors must provide a level of training that meets the requirements and instructions of the Carrier as detailed in Paragraph 16 of this Annex B.

4.7     In addition to Sub-Article 1.6 of the Main Agreement, the Handling Company shall demonstrate the existence of emergency response plan(s) including business continuity plans to the satisfaction of the Carrier. The Handling Company shall test these plans no less than annually using a mock emergency exercise and upon doing so shall promptly submit to the Carrier a report setting out the results of such test. For the avoidance of doubt, where the Carrier issues its own emergency procedures to the Handling Company, these shall take precedence.

4.8     The Handling Company shall actively participate in the Carrier's Local Emergency Procedures and exercises as required.

4.9     The Handling Company shall actively support and be involved in any type of compliance audit (e.g. safety, security, operations and self-audit) that the Carrier, other agency or other organisation acting on behalf of the Carrier may request and/or undertake during the course of this Agreement.   This shall include the Handling Company conducting regular oversight inspections to ensure operational and contractual requirements are adhered to, using subsequent data to support the effective management of hazards and mitigation of risk in association with the Handling Company's Safety Management System. The Handling Company shall make available for viewing or observations to the Carrier, when requested, evidence of such oversight.

4.10    The Handling Company shall ensure that potable water processes and hygiene must comply with the current recommendations issued by IATA, World Health Organisation (WHO) or other national or international regulatory bodies.

4.11    The Handling Company shall maintain all vehicles and equipment necessary for the performance of its obligations under this Agreement in fully serviceable conditions and shall fit fire-fighting and other protective equipment to all ground service equipment (where required), in accordance with the Carrier's instructions and in accordance with the ICAO Airport Operational Services Manual, the IATA Ground

Handling Manual or the airport authority's by-law or regulations. Where there is a conflict in instructions, the Carrier's instructions shall take precedence.

4.12    At all times while on duty, the Handling Company's staff shall wear the Handling Company's uniform and/or agreed identification elements and shall be of smart appearance and, where in contact with the Carrier's customers, shall at all times be physically fit to undertake their assigned functions, possess and wear at all relevant times suitable fluorescent jackets and/or protective clothing or equipment and appear and behave appropriately and in accordance with any policies or processes of the Carrier. The Handling Company will bear the cost of the uniform in accordance with the Carrier's uniform policy and standards at the time of signing this Agreement.

4.13    The Handling Company shall ensure that all persons working on behalf of the Carrier shall be in possession of the appropriate and current airport identification passes and/or permits issued in the name of the Handling Company.

4.14    Members of the Handling Company staff that shall have communications with the Carrier's customers, crew, local staff and/or head office staff in the course of their duties shall have a good command of written and spoken English. In particular, the Handling Company shall ensure and be able to demonstrate that all staff required to communicate flight safety critical information to the flight crew have sufficient proficiency in the English language to communicate such information accurately and properly.

4.15    Where facilities are not provided by the Carrier, the Carrier is entitled to store a reasonable amount of company materials in the Handling Company's facilities or warehouse without extra charge.

4.16    Where facilities are not provided by the Carrier, the Handling Company shall retain the Carrier's documents in a safe and secure storage area free of charge as advised by the Carrier. No documents shall be destroyed without the permission of the Carrier's nominated representative.

4.17    As part of the provision of service, the Carrier requires a Handling Company Key Account Manager. The Key Account Manager (KAM) will be the prime point of contact between the Carrier's Operations Management Team and the Handling Company. The KAM will be a single point of contact and will be consistent, where possible, on a seasonal basis. The KAM will be suitably experienced and proficient to be responsible for the operational business relationship between the Handling Company and the Carrier. The KAM will be the point of contact for Compliance issues such as Safety Management System, incident reporting, acknowledgement and implementation of Ground Handling Bulletins and Instructions. In addition the KAM will be responsible for the Handling Company's designated activities in connection with commercial revenue and achievement of the Service Level Agreement.

4.18    In the event of the Carrier providing the Handling Company with iPads, tablets, scanners or other equipment to support the operation, the Handling Company shall retain such equipment in safe and secure storage free of charge.  The Handling Company shall bear all costs incurred by the Carrier in repairing or replacing these items due to damage or loss caused directly by the Handling Company.

**PARAGRAPH 5.       SURCHARGES**

5.1    No extra charges will apply for providing the Services to the Carrier's off schedule operation, ground interruption and/or overnight off schedule operation provided that the Services can be covered by existing shift personnel. In case Services are delivered outside the existing shift personnel the charges (including any agreed inclusive allowance) are set out in Appendix 2, Additional Services and Charges below.

5.2    No extra charges shall be made for providing the Services at night, weekends or legal or public holidays.

5.3    There will be no surcharge levied for operations beyond a prescribed time of turnaround, transit or night stop.  In case Services are delivered outside the existing shift personnel the charges (including any agreed inclusive allowance) are set out in Appendix 2, Additional Services and Charges below.

**PARAGRAPH 6.       DISBURSEMENTS, CHARGES, FEES, TAXES AND OTHER EXPENSES**

6.1    Any disbursements made by the Handling Company on behalf of the Carrier shall be reimbursed by the Carrier at cost price plus 5% provided that the disbursements were incurred with the prior approval of the Carrier.

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

## PARAGRAPH 7.     LIQUIDATED DAMAGES

7.1     In accordance with Sub-Paragraph 1.1 the Handling Company shall perform the services in accordance with the Service Level Agreement as set out in Appendix 1 (hereinafter referred to as the "Service Level Agreement"). The Parties acknowledge that the liquidated damages (otherwise known as service credits) set out in the attached Service Level Agreement are a reasonable pre-estimate of the loss and damage which will be suffered by the Carrier in the event of the Handling Company's failure to perform the services in accordance with the Service Level Agreement. Payment by the Handling Company of the liquidated damages (or service credits) as set out in the Service Level Agreement shall be without prejudice to any other rights and remedies which the Carrier may have under this Agreement and/or applicable law, including the right to terminate this Agreement.

## PARAGRAPH 8.     LIMIT OF LIABILITY

8.1     The limit of liability referred to in Sub-Article 8.5 of the Main Agreement shall be as follows

| Aircraft Type | Per Incident (USD) |
|---|---|
| A330/340/350/380/787/777/767/757 | 1,000,000 |
| A318/319/320/321/737 | 750,000 |

8.2     The above limits of liability have been determined by reference to the standard deductible by international aviation insurance markets and specified currently in the Carrier's Hull All Risk Policy and will vary accordingly from time to time, but subject to the liability of the Handling Company hereunder not exceeding USD 1.5 million.

## PARAGRAPH 9.     LIABILITY OF HANDLING COMPANY FOR TRAVEL DOCUMENTS AND REGULATORY FINES

9.1     Notwithstanding any provision to the contrary in the Main Agreement and/or Annex A, the Handling Company will indemnify the Carrier in respect of any fines, levies or penalties imposed by a regulatory authority on the Carrier which are attributable to acts or omissions of the Handling Company save where the Handling Company is acting in accordance with a written instruction of the Carrier.

9.2     Intentionally Not Used.

9.3     In case of any fines, levies or penalties referred to in Sub-Paragraph 9.1 above being imposed on the Carrier, the Carrier shall forward to the Handling Company appropriate supporting documentation and the Carrier shall, in consultation with the Handling Company, take reasonable steps to mitigate the fine.

## PARAGRAPH 10.     ASSIGNMENT AND SUBCONTRACTING

10.1     Notwithstanding Article 3, Sub-Article 3.1 of the Main Agreement or any other provision to the contrary, the Handling Company is not entitled to assign, subcontract or otherwise transfer or dispose of any of its rights or obligations under this Agreement without the prior written consent of the Carrier. In the event that the Carrier, in its sole discretion, grants the Handling Company written permission to subcontract the performance of any Services, the Handling Company shall:

10.1.1   Supervise the performance of such subcontracted services

10.1.2   Nevertheless be responsible to the Carrier for the proper rendering of such services as if they had been performed by the Handling Company itself and shall remain liable for such services to the full extent Article 8 of the Main Agreement as modified in this Agreement herein.

10.2     The Parties agree that in the event any element of the Services is subcontracted the details of such subcontracting shall be set out in the relevant table included in Appendix 2.

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

## PARAGRAPH 11    FORCE MAJEURE

11.1    Sub-Article 11.9 of the Main Agreement shall not apply.  Notwithstanding any other provision to the contrary, both Parties shall be exempt from obligation if prompt notification is given by either Party in respect of any failure to perform its obligations under this Agreement arising from Force Majeure.  For the purpose of this Paragraph "Force Majeure" shall mean an event which is beyond the reasonable control of the Party claiming Force Majeure including an event which falls in to one or more of the following categories where these are beyond that Party's reasonable control: act of God, fire, flood and war, riot, civil commotion, explosion or malicious damage.  Mere shortage of materials, equipment, labour or supplies shall not constitute Force Majeure, and neither shall strike, lockout or labour dispute.

## PARAGRAPH 12.    SETTLEMENT

12.1    Notwithstanding Article 7, Sub-Articles 7.1 and 7.2 of the Main Agreement or any other provision to the contrary, the Handling Company shall invoice the Carrier bi-monthly for the services performed. Settlement shall be made directly to the Handling Company fifteen (15) days from receipt of a correctly submitted invoice through the Carrier's payment process. Invoices shall be sent to:

**ba.rotw.invoices@iairgroup.com**

Handling Company Bank Details:

| Bank Name | Bank of America |
|---|---|
| Address | 12124 High Tech Ave STE 200, Orlando, FL 32817 |
| Routing number ACH/EFT | 111000012 |
| Routing number DOM. WIRES | 026009593 |
| Account Number | 4427298297 |
| SWIFT Code | BOFAUS3N |
| Beneficiary | Ground Services International Incorporated |

12.2    The Carrier requires accurate supporting documentation to substantiate all charges. Any documentation not supplied in accordance with this Agreement, including unsupported or unauthorised ad-hoc items not clearly identified as being requested by the Carrier or authorised by a representative of the Carrier will not be considered for payment.

12.3    In the event that disbursements relating to the provision of services under 1.2.6(b) of the Annex A occurs settlement shall only be made where the service provided was authorised by the Carrier and where the invoice is accompanied by all applicable reports, invoices, vouchers and supporting information.

12.4    In the event the Carrier disputes an invoice in good faith it shall endeavour to provide the Handling Company with written details of the disputed element within (30) days of receipt of the invoice. No charges for late payment of an invoice will be accepted if the supporting documents have not been provided.

12.5    The Handling Company will advise the Carrier of any changes in their bank details and contact details.

12.6    The Handling Company shall not invoice the Carrier, nor shall the Carrier be liable for services rendered where such an invoice would result in a charge pertaining to services provided (either direct, by subcontractor, subject to disbursement or otherwise) more than six (6) months in advance of the date of the invoice.  The Carrier shall not dispute the Handling Company, nor shall the Handling Company be liable for services rendered where such an invoice would result in a credit pertaining to services provided (either direct, by subcontractor, subject to disbursement or otherwise) more than six (6) months in advance of the date of the invoice.

12.7    The Handling Company reserves the right to charge 1% interest per month on overdue amounts not in dispute, thirty (30) days past the date the invoice became due. No charges for late payment of an invoice will be accepted if the supporting documents have not been provided.

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

## PARAGRAPH 13.        CHARGES, DURATION, MODIFICATION AND TERMINATION

13.1    Charges:

13.1.1  Sub-Article 11.11 and 11.12 of the Main Agreement shall not apply.

13.1.2  For the purpose of this Sub-Paragraph 13.1 the expression 'Rate(s)' means that the rates set out in Paragraph 1 and Paragraph 2.

13.1.3  Notwithstanding Sub-Paragraph 13.1.4 the Rates shall not be varied in the event that either Party has served notice of termination in accordance with the terms set out in this Agreement.

13.1.4  Subject only to the provisions of this Sub-Paragraph 13.1 the Rates are fixed for the duration of this Agreement. With the exception that rates shall only be adjusted:

    i)    In the event there is a mandatory minimum or living wage for the state of Illinois which has been adjusted by government, state or airport authority and is unavoidable by the Handling Company and causes an increase in the Handling Company's direct manpower cost of performing its Services to the Carrier, then within 30 (thirty) days after the adjustment has entered into force, a 85% component of the ramp handling charges shall be adjusted at the same rate as the adjustment of the mandatory minimum wage

    ii)    In the event of a government mandated and unavoidable increase related directly to the cost of employment of the Handling Company's staff who deal directly with the services under this Agreement where such increase was unknown and was not reasonably contemplated as of the Effective Date of this Agreement and which materially affects the cost of providing the handling services, then the Handling Company may promptly request the Carrier to accept a rate adjustment at a 85% component of the ramp handling charges shall be adjusted at the same rate as the adjustment of the mandatory increase, within 30 (thirty) days after the adjustment has entered into force.

13.2    Duration:

13.2.1  Subject to Sub-Paragraph 13.4.1 below and notwithstanding Sub-Articles 11.4 and 11.5 of the Main Agreement, (but without prejudice to Sub-Article 11.8 of the Main Agreement) this Agreement shall continue in effect for a period of three (3) years from the Effective Date.

13.2.2  Notwithstanding Sub-Article 11.6 of the Main Agreement, after the defined term specified in Sub-Paragraph 13.2.1, this Annex B shall continue in effect until terminated by either party providing ninety (90) days prior notice to the other party. In the event that the Handling Company intends for the Agreement to terminate upon the expiration of the term specified in Sub-Paragraph 13.2.1 then the Handling Company is required to give 90 days prior written notice to the Carrier.

13.3    Modification:

13.3.1  Notwithstanding Sub-Article 11.2 of the Main Agreement, any modification to this Agreement shall be in the form of a Change Order attached as Appendix 3 hereto and agreed and signed by authorised representatives of both Parties.  Unless otherwise agreed in writing between the Parties any modification that does not comply with this Paragraph 13.3.1 shall be deemed null and void.

13.3.2  During the course of this Agreement, the Carrier may review its operations specification, processes and technology with the objective of reducing costs. The Parties agree to review the Carrier's operational requirements periodically to achieve reduction in the Carrier's cost by mutual agreement.

13.3.3  The Handling Company agrees to review its cost structure periodically during the course of this Agreement with the objective of reducing the Carrier's cost through the Handling Company's productivity and efficiency gains as well as the addition of new business that drive synergies of equipment and manpower.

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

13.4    Termination:

13.4.1  Intentionally Not Used.

13.4.2  Notwithstanding Sub-Paragraph 13.2 of this Annex B, this Annex B may be terminated by the Carrier in the event of:

(i) a failure by the Handling Company to achieve the agreed service standards.  In such event the Handling Company shall be notified in writing by the Carrier by giving a thirty (30) day improvement notice. If after thirty (30) days, the service standards have not improved to the Carrier's reasonable satisfaction, the Carrier may terminate this Agreement upon written notice with immediate effect; or,

(ii) a material breach by the Handling Company of its obligations under this Agreement which is not remedied by the Handling Company (where such breach is capable of remedy) within thirty (30) days of being called on to do so by the Carrier; or

(iii) failure by the Handling Company to perform its obligations under the Main Agreement and/or this Annex B, other than as specified in Article 11.8 of the Main Agreement and other than as specified elsewhere in this Paragraph 13.4.2, and in such event, upon the Carrier giving the Handling Company 30 days' written notice of such termination; or,

(iv) a serious safety incident, and in such event, immediately upon the Carrier giving written notice of such termination to the Handling Company; or

(v) a non-compliance incident or failure of a compliance audit not remedied within the timescales as determined by the regulatory body or in the audit report, and in such event, immediately upon the Carrier giving written notice of such termination to the Handling Company; or

(vii) in the event of the Carrier ceasing operations to any of the locations to which this Agreement applies, the Agreement will terminate for that location upon the cessation of such Carrier operations; or

(viii) in accordance with any other provision of this Agreement which provides for the Carrier's right of termination

13.4.3  During the termination notice period, the Handling Company shall continue to provide the Services in accordance with this Agreement (including to the Service Standard set forth herein).

## PARAGRAPH 14.    NOTIFICATION

14.1    In accordance with Sub-Article 11.3 of the Main Agreement or any other provision to the contrary, any notice or communication to be given hereunder shall be addressed to the respective Parties as follows:

To Carrier:

| Carrier | British Airways Plc |
|---|---|
| Street | Waterside (HAB2) |
| City | PO Box 365, Harmondsworth |
| Post Code | UB7 0GB |
| Country | United Kingdom |
| E-mail | Procurement.operations@iairgroup.com |
| Attn: | Ground Operations Procurement |

To Handling Company:

| Handling Company | Ground Services International, Inc dba Dnata |
|---|---|
| Street | 12124 High Tech Ave, Suite 200 |
| City, Country | Orlando, Florida |
| ZIP | 32817 |
| Telephone | +1 407-493-5575 |
| E-mail | David.barker@dnata.us |
| Attn: | John David Barker, CEO |

14.2    The above addresses may be changed by notice given in writing from time to time by the respective Parties in accordance with Sub-Paragraph 13.3.1 of this Annex B.

**PARAGRAPH 15.      SAFETY OCCURRENCE REPORTING AND INVESTIGATION**

15.1    The Carrier shall provide a copy of the Carrier's Safety Manual to the Handling Company. Such access shall be by online portal or some other similar document controlled means. The Handling Company shall comply with such Safety Manual and any other safety and security guidelines established by the Carrier from time to time. The Handling Company will report any incident or occurrence affecting safety in accordance with the procedures contained in the Safety Manual. Specifically, the Handling Company shall provide initial report details in line with the 72 hour deadline required in the Safety Manual

15.2    The Handling Company shall provide a copy of any internal investigation it has undertaken in relation to any occurrence affecting the safety of any of the Carrier's aircraft.

15.3    The Carrier shall have the right at any time to carry out an investigation into any accident, incident or occurrence affecting the Carrier's aircraft. The Carrier's Safety Manager shall be responsible for initiating any such investigation. The exercise of such right of investigation will be subject to reasonable notice and at reasonable times (unless the matter, taking all relevant circumstances into account, requires immediate investigation). During such investigation, the Carrier shall, accompanied by one or more of the Handling Company's personnel as the Handling Company may decide, have the access reasonably required to relevant Handling Company personnel, equipment, records and documents.

15.4    Following completion of the investigation, the Handling Company shall, for the purpose of review and comment be provided with the draft report at least thirty (30) days prior to release.

**PARAGRAPH 16.      TRAINING**

16.1    The Handling Company shall ensure that all staff performing services on behalf of the Carrier will have received the appropriate training as determined by the Carrier.

16.2    The Carrier shall provide training on a train-the-trainer basis by annual refresher training as deemed necessary by the Carrier, at a location determined by the Carrier.

16.3    The full costs associated with training the Handling Company's employees by the Handling Company's trainer(s) shall be borne by the Handling Company.

16.4    The Handling Company shall bear all training costs associated with the turnover of its staff.

16.5    Where training is provided at the Carrier's site, the costs for the training courses, trainer's fee, training material, hotel accommodation (including breakfast) and air tickets to the training location are borne by the Carrier, the salary and per diem allowance of the staff under the applicable training are borne by the Handling Company.

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

16.6    Where training is provided at the Handling Company's site, all costs incurred by the Carrier's trainer(s), including *inter alia* travel, transport, accommodation and per diem expenses as well as all training materials shall be borne by the Carrier; all other costs shall be borne by the Handling Company.

16.7    The Handling Company is required to maintain updated training records for all relevant staff in accordance with mandatory governing rules, regulations and procedures.  Relevant training records should be made available to the Carrier's representatives when required.

16.8    If a specific new system or procedure is put in place by the carrier, the training cost associated with this will be borne by the carrier, the salary and per diem allowance of the staff under the applicable training are borne by the Handling Company

## PARAGRAPH 17.    CONFIDENTIALITY

17.1    Each Party shall use reasonable precautions to keep confidential and shall not copy, issue, provide access to or in any way disclose to any third party, or use for its own business purposes, any documents or other information (i) which one party to this Agreement may have, or acquires, in relation to the customers, business, assets or affairs of the other party; or (ii) which relates to the contents of this Agreement. ("Confidential Information"), unless otherwise authorised by the prior written consent of the other Party.

17.2    This Paragraph 17 shall not apply to:

17.2.1    information which is independently developed by the receiving Party or acquired from a third party with the right of disclosure; or

14.2.2.   information required to be disclosed by law, any stock exchange regulation or any binding judgement, order or requirement of any court or public authority; or

17.2.3    information in the public domain (other than as a result of any breach by a Party of this Paragraph 17); or

17.2.4    in the case of the Carrier, the distribution of Confidential Information to the Carrier's Affiliates where such companies agree to be bound by the same confidentiality obligations as the Carrie; or

17.2.5    the sharing of the contents of this Agreement with a carrier operating on behalf of the Carrier and who is receiving the Services under this Agreement, provided always that i) the agreement is redacted such that the commercial terms including rates are obscured and ii) only to the extent necessary to provide confirmation to the other carrier that the Services are contracted by the Carrier.

17.3    The Handling Company shall procure that all its officers, employees, sub-contractors, and agents comply with the confidentiality requirements contained herein.

17.4    For the avoidance of doubt, the provisions of this Paragraph 17 shall survive the termination or expiry of this Agreement.

## PARAGRAPH 18.    DATA PROTECTION

18.1    For the purposes of this Agreement the following terms shall have the following meaning:

18.1.1    "Data Protection Legislation" shall mean all applicable laws relating to data protection and privacy including (without limitation) the EU Data Protection Directive (95/46/EC) as implemented in each jurisdiction, the EU General Data Protection Regulation (2016/679), the EU Privacy and Electronic Communications Directive 2002/58/EC as implemented in each jurisdiction, and any amending or replacement legislation from time to time;

18.1.2    "Carrier Personal Data"  shall mean all personal data (as defined in the Data Protection Legislation) controlled by the Carrier or an IAG Group Company which is processed by the Handling Company in connection with the Services;

18.2    In this clause, the terms "personal data", "process", "data controller", "data processor", "data subject" and "supervisory authority" shall have the meanings set out in the Data Protection Legislation.

18.3    The Handling Company is appointed by the Carrier to process Carrier Personal Data on behalf of the Carrier (or IAG Group, as applicable) as is necessary to provide the Services and in accordance with such other written instructions as the Carrier may issue from time to time.

18.4    The Handling Company hereby acknowledges that Carrier Personal Data may originate from one or more such IAG Group Companies. The Carrier hereby confirms that it is authorized to communicate any instructions or other requirements on behalf of such IAG Group Companies to the Handling Company in respect of the Services.

18.5    Each party shall comply with its obligations under the Data Protection Legislation in respect of any personal data it processes under or in relation to this Agreement. Without prejudice to the foregoing, the Handling Company shall not process Carrier Personal Data in a manner that will or is likely to result in the Carrier or IAG Group Company breaching its obligations under the Data Protection Legislation.

18.6    The categories of Carrier Personal Data to be processed by the Handling Company and the processing activities to be performed under this Agreement are set out in Appendix 7.

18.7    The Handling Company warrants and undertakes in respect of all Carrier Personal Data that at all times it shall:

18.7.1    only process Carrier Personal Data in accordance with the documented instructions given from time to time by the Carrier, including with regard to transfers, unless required to do otherwise by EU law or the national law of an EU member state to which the Handling Company is subject. In which event, the Handling Company shall inform the Carrier of the legal requirement before processing Carrier Personal Data other than in accordance with the Carrier's instructions, unless that same law prohibits the Handling Company from doing so on important grounds of public interest;

18.7.2    implement appropriate technical and organisational measures to protect any Carrier Personal Data processed by it against unauthorised and unlawful processing and against accidental loss, destruction, disclosure, damage or alteration.

18.7.3    not publish, disclose or divulge (and ensure that its personnel do not publish, disclose or divulge) any Carrier Personal Data to a third party unless the Carrier has given its prior written consent;

18.7.4    ensure that only such of its personnel who may be required by the Handling Company to assist it in meeting its obligations under this Agreement will have access to Carrier Personal Data and that such personnel are bound by appropriate obligations of confidentiality, and take all reasonable steps in accordance with best industry practice to ensure the reliability of such personnel;

18.7.5    inform the Carrier promptly and in any event within two (2) business days, of any enquiry or complaint received from a data subject or supervisory authority relating to Carrier Personal Data;

18.7.6    at no additional cost, provide full cooperation and assistance to the Carrier and IAG Group Company as the Carrier may require to allow the Carrier or IAG Group Company (as applicable) to comply with its obligations as a data controller, including in relation to data security; data breach notification; data protection impact assessments; prior consultation with supervisory authorities; the fulfilment of data subjects' rights; and any enquiry, notice or investigation by a supervisory authority; and

18.7.7    at the request and option of the Carrier (whether during or following termination of this Agreement), promptly and as specified by the Carrier return or destroy all Carrier Personal Data in the possession or control of the Handling Company.

18.8    Notwithstanding any other provisions of this Agreement, the Handling Company shall not appoint any third party to process Carrier Personal Data ("Subprocessor") without the Carrier's prior written consent, and subject in all cases to the Handling Company:

18.8.1    providing reasonable prior notice to the Carrier of the identity and location of the Subprocessor and a description of the intended processing to be carried out by the Subprocessor to enable the Carrier to evaluate any potential risks to Carrier Personal Data; and

18.8.2  imposing legally binding contract terms on the Subprocessor which are the same as those contained in this Agreement.

18.9  The Handling Company acknowledges and agrees that it shall remain liable to the Carrier for a breach of the terms of this Agreement by a Subprocessor and other subsequent third party processors appointed by it.

18.10  The Handling Company shall notify the Carrier in the most expedient time possible under the circumstances and in any event within 24 (twenty-four) hours of becoming aware of any actual or suspected accidental, unauthorized, or unlawful destruction, loss, alteration, or disclosure of, or access to, Carrier Personal Data ("Security Breach). The Handling Company shall also provide the Carrier with a detailed description of the Security Breach, the type of data that was the subject of the Security Breach and (to the extent known to the Handling Company) the identity of each affected person, as soon as such information can be collected or otherwise becomes available, as well as all other information and co-operation which the Carrier may reasonably request relating to the Security Breach.

18.11  The Handling Company agrees to take action immediately, at its own expense, to investigate the Security Breach and to identify, prevent and mitigate the effects of any such Security Breach and, with the Carrier's prior agreement, to carry out any recovery or other action necessary to remedy the Security Breach.

18.12  The Handling Company may not issue, publish or make available to any third party any press release or other communication concerning a Security Breach without the Carrier's prior approval.

18.13  The Carrier hereby consents to Customer Personal Data being transferred outside the EEA, subject to the Handling Company's continued compliance with clause 18.14 and clause 18.15 throughout the duration of this Agreement.

18.14  To the extent that any Carrier Personal Data is transferred outside the EEA, the terms of the transfer shall be governed by the EU Standard Contractual Clauses for the transfer of personal data to processors attached as Appendix 8 which are hereby incorporated into this Agreement. The Handling Company further agrees to enter into the Standard Contractual Clauses with any other Customer Group Company on request.

18.15  If, for whatever reason, the transfer of Carrier Personal Data under Clause 18.14 ceases to be lawful, the Handling Company shall either:

(a)  with the Carrier's consent, implement an alternative lawful transfer mechanism; or

(b)  allow the Carrier to terminate the Agreement at no additional cost to the Carrier.

18.16  The Handling Company shall make available to the Carrier all information necessary to demonstrate compliance with this Paragraph 18 (Data Protection) and allow for and contribute to audits, including physical inspections, conducted by the Carrier or its representatives bound by appropriate obligations of confidentiality.

18.17  Notwithstanding any provision to the contrary in the Main Agreement and/or Annex A, the Handling Company shall indemnify and keep the Carrier fully and effectively indemnified in respect of direct losses, damages, costs, charges, expenses and liabilities (including regulatory penalties imposed on the Carrier and/or Carrier Group Companies) arising as a direct result of a breach by the Handling Company of this Paragraph 18 (Data Protection). Notwithstanding any other limit of liability in the Agreement, the Handling Company's liability for one or more breaches arising out of any single event relating to Paragraph 18 of this Agreement shall be subject to a maximum of $1.5m for each event, unless done with intent to cause damage or loss, or recklessly and with the knowledge that damage or loss would probably result, in which cases the Handling Company's liability for one or more breaches arising out of any single event relating to Paragraph 18 of this Agreement shall be subject to a maximum of $2.5m for each such event.

## PARAGRAPH 19.     DATA COLLECTION AND TRANSMISSION

19.1    Where regulatory requirements exist, the Handling Company shall capture and transmit Advance Passenger Information (API) on the Carrier's behalf and in accordance with legislative requirements and provisions of Paragraph 18 (Data Protection).

## PARAGRAPH 20.     CHANGE OF CONTROL

20.1    The Carrier reserves the right to terminate this Agreement immediately on notice of a Change of Control of the Handling Company. The Handling Company shall give the Carrier immediate notice of any Change of Control event that would give the Carrier the right to terminate this Agreement.

20.2    By definition, Change of Control means a change in the control of a person where "Control" in relation to the Handling Company, means the power of a person to secure

20.2.1    by means of the holding of shares or the possession of voting power in or in relation to that or any other body corporate; or

20.2.2    by virtue of any powers conferred by the articles of association or articles of incorporation or other document regulating that or any other body corporate,

that the affairs of the Handling Company are conducted in accordance with the wishes of that person, and, in relation to a partnership, means the right to a share of more than one-half of the assets, or of more than one-half of the income, of the partnership.  For the avoidance of doubt, the term "person" includes legal entities of any form.

20.3    Without prejudice to the Carrier's other rights and remedies pursuant to this Agreement, in the event of a Change of Control of the Handling Company, the Carrier shall, in addition to its other rights and remedies, have the right at its sole discretion to terminate any of the services in whole or in part performed at one or more of the locations covered by this Agreement.

20.4    The Carrier shall not be liable to pay damages to the Handling Company in the event of a termination pursuant to this Paragraph 20.

## PARAGRAPH 21.     ANTI-BRIBERY AND ANTI-CORRUPTION

21.1    For the purpose of this Paragraph, 'Bribery Legislation' means the applicable anti-bribery or anti-corruption laws of any country in which the Handling Company is located or is performing its obligations pursuant to this Agreement as such laws are currently in effect and may be amended from time to time and including, but not limited to the United Kingdom Bribery Act 2010 or any applicable law creating offences in respect of bribery or fraudulent or corrupt acts.

21.2    It is the policy of the Carrier is to conduct all of its business in an honest and ethical manner and to comply with all applicable anti-corruption legislation. The Carrier takes a strict approach to anti-bribery and anti-corruption and is committed to acting professionally and with integrity in all its business dealings wherever it operates.

21.3    Handling Company warrants to the Carrier that, to the best of its knowledge, neither it nor any of its directors, employees, agents, representatives, contractors or sub-contractors has at any time prior to entering into this Agreement, committed any offence under any Bribery Legislation.

21.4    Handling Company further warrants to the Carrier that it is not entering into this Agreement with any knowledge that any money has been, or will be, paid to any person working for or engaged by the Carrier or any member of the Carrier group or that an agreement has been made to that effect, unless details of any such arrangement have been disclosed in writing to the Carrier before the date this Agreement comes into effect.

21.5    Handling Company agrees that, at any time after the entry into of this Agreement it shall not and it shall procure that its directors, employees, agents, representatives, contractors or sub-contractors shall not: (a) commit any offence under any Bribery Legislation; or (b) cause the directors, employees, agents, representatives, contractors or sub-contractors of any affiliate to commit any offence under any Bribery Legislation.

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

21.6     Handling Company (including any of its directors, employees, agents, representatives, contractors or sub-contractors, in all cases whether or not acting with the Carrier's or the relevant member of the Carrier Group's knowledge) breaches this Paragraph, the Carrier may terminate this Agreement by written notice with immediate effect.

21.7     Handling Company shall have in place adequate procedures designed to prevent any person working for or engaged by Handling Company or any other third party in any way connected to this Agreement, from committing offences of corruption or bribery.

21.8     Handling Company shall maintain a record of all entertainment, hospitality and gifts given to or received from any third party in the direct or indirect carrying out of its obligations under this Agreement and provide an up-to-date copy of such record to the Carrier upon request.

## PARAGRAPH 22.     RIGHT TO AUDIT

22.1     The Handling Company shall allow the Carrier, by reasonable notification, to access audit, copy and reproduce the books, records, correspondence, instructions, receipts and memoranda of every description relating to this Agreement.

22.2     The Handling Company will provide the Carrier with an agreed action plan with appropriate agreed timescales to correct any deficiencies notified to the Handling Company as a result of an audit, following which the Handling Company will implement the terms of such plan as soon as practicable.

## PARAGRAPH 23.     SYSTEMS USAGE

23.1     The Handling Company shall use the Carrier's own departure control/load control system, software and processes. When not provided by the Carrier, the Handling Company shall ensure that the necessary hardware and network connectivity to access the Carrier's systems is available as appropriate at no cost to the Carrier.

## PARAGRAPH 24.     BRANDING, SIGNAGE, FURNITURE AND PUBLICITY

24.1     Intentionally Not Used.

24.2     Subject to the requirements of law or the rules of any regulatory authority, no public announcement, press release or circular relating to this Agreement or the arrangements to be performed pursuant to it shall be made or issued by or on behalf of any Party without the prior written approval of the other Party, such approval not to be unreasonably withheld or delayed.

## PARAGRAPH 25.     GOVERNING LAW AND JURISDICTION

25.1     In accordance with Article 9 of the Main Agreement, this Agreement shall be governed by and interpreted in accordance with the laws of Chicago, Illinois.

## PARAGRAPH 26.     ANTI-SLAVERY AND HUMAN TRAFFICKING

26.1     The Handling Company shall and shall procure that its directors, employees, agents, representatives, contractors or sub-contractors shall comply with all applicable anti-slavery and human trafficking laws, statutes, regulations and codes from time to time in force including, but not limited to, the UK Modern Slavery Act 2015.

26.2     The Handling Company shall comply with the Carrier's anti-slavery policy which may be found at http://media.corporate-ir.net/media_files/IROL/24/240949/Resp/IAGCargo_UK_Slavery_Human_trafficking_Q2_2018.pdf

26.3     The Handling Company shall not engage in any activity, practice or conduct that would constitute an offence under sections 1, 2 or 4 of the UK Modern Slavery Act 2015 if such activity, practice or conduct were carried out in the UK.

26.4     Breach of this Clause shall entitle the Carrier to terminate this Agreement by written notice with immediate effect.

**PARAGRAPH 27.      CORPORATE ENVIRONMENTAL RESPONSIBILITY**

27.1    The Handling Company agrees to ensure that the obligations set out in this Agreement are performed in a manner which is consistent with the International Airline Group Environmental Responsibility Policy set out in Appendix 6 attached hereto.

27.2    The Handling Company undertakes to respect the IAG Supplier Code of Conduct as can be found on the IAG website.

27.3    The Handling Company agrees to develop and implement relevant environmental policies, programmes and procedures such as they relate to this Agreement and these shall be to the satisfaction of the Carrier.

27.4    The Handling Company agrees that in addition to the obligations set out above, it shall at all times comply with any applicable environmental laws or regulations when performing any obligations under this Agreement.

Signed the   `06-jul.-2021 | 10:06:11 AM BST`

at   `Barcelona`

for and on behalf of British Airways Plc

.................................................

By: Patricia Cortada Fontova

Title: Head of Ground Handling

.................................................

By: Atish Sahota

Title: Category Lead

Signed the   `03-Jul-2021 | 10:58:21 AM PDT`

at   `Orlando`

for and on behalf of Ground Service International, Inc, dba Dnata

.................................................

By: John David Barker

Title: CEO

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

**Appendix 1** to Annex B1.1 of the IATA standard Ground Handling Agreement between British Airways Plc and Ground Service International, Inc, dba Dnata valid as from 1st February 2021 for the location Chicago O'Hare International Airport (ORD).

# Service Level Agreement

| Nr | Description | Monthly Target | Measuring method | Action |
|---|---|---|---|---|
| 1 | Significant safety incidents & aircraft damages | 0% | Ground Incident or Accident Report | Performance review |
| | The Handling Company will consistently demonstrate that safety and security are their first priorities. All incidents shall be appropriately handled and communicated immediately to the carrier's representative. Significant safety incidents include: Aircraft damage, unsecure load incidents, dangerous goods incidents, aircraft doors or holds incidents, customer injuries, staff or crew injuries, AAA failures, airfield incidents or accidents or any issue that could cause the carrier reputational damage. | | | |
| 2 | ARTG (Aircraft Ready to Go) aircraft doors closure at STD-5 mins (BA Only) | 96% | Carrier's punctuality reporting system | 5% rebate of basic turnaround fee on affected flights and performance review |
| | Delay codes attributable to the Handling Company used to calculate the ARTG performance are. Ramp: DG, GA, GC, GD, GE, GL, GS, GT, GTB, GTC, GTP, GW, OT, PB, PX, TW, VT, XB, MO | | | |
| 3 | Ground Time Performance delays over 15 minutes of STD | 99% | Carrier's punctuality reporting system | 10% rebate on basic turnaround fee on affected flights and performance review |
| | Delay codes attributable to the Handling Company and used to calculate the Ground Time Performance are IATA codes: 5, 6, 11, 12, 13, 15, 18, 31, 32, 33, 34, 39, 52, 75 (if provided by GHA) & 98. For BA. Ramp: DG, GA, GC, GD, GE, GL, GS, GT, GTB, GTC, GTP, GW, OT, PB, PX, TW, VT, XB, MO. | | | |
| 4 | Point to point mishandled bags per station | <1 x 1000 Pax | World Tracer Reports | 25USD rebate per mishandled bag over the target (Not to exceed 25% of the affected flights) |
| | Mishandled bag codes attributable to the handling company used to calculate this target are World Tracer reason for loss codes: 21, 23, 25, 26, 31, 32, 33, 35, 41, 42 & 43 | | | |
| 5 | Connecting flights mishandled bags per station | <3 x 1000 Pax | World Tracer Reports | 25USD rebate per mishandled bag over the target (Not to exceed 25% of the handling rate) |
| | Mishandled bag codes attributable to the handling company used to calculate this target are World Tracer reason for loss codes:  Ramp: 21, 23, 25, 26, 31, 32, 33, 35, 41, 42, 43, 51, 52, 53, 54, 55, 56, 57 & 58 | | | |
| 8 | Aircraft safety inspection:
Upon arrival (before any equipment positioned) at ATA+1    Before departure (after all equipment removed) by ETD-3 | 100% | Carrier supervision, audits or crew reports | Performance review |
| 9 | Clear stand of foreign objects debris at ETA-5 & ETD-3 | 100% | Carrier supervision or audit reports | Performance review |
| 10 | Positioning of chocks, safety devices and Ground Servicing Equipment (in this order) by ATA +2 | 100% | Carrier supervision, audits or crew reports | Performance review |
| 11 | All GSE and safety devices removed, hold doors closed, headset attached & aircraft ready for departure by ETD-5 | 100% | Carrier supervision, audits or crew reports | Performance review |
| 12 | At arrival, the First Bag (FB) & Last Bag (LB) delivered by:
Long Haul FB: ATA+20 & LB: ATA+45
(Priority baggage will be delivered first, if applicable) | 100% | Carrier supervision, audit reports or airport reports | Performance review |
| 13 | In the event that the inbound flight operates off schedule, the Handling Agent should use its best efforts to reduce the turnaround time in accordance to the "minimum turnaround time" as specified in the engagement standards table. | 100% | Audit Reports | Performance review |
| 15 | Adherence & compliance with the Carrier's Ground Operations Manual | 100% | Carrier supervision, audits or crew reports | Performance review |

The Handling company agrees to comply with the Service Level Agreements and the Ground Operations Manual (GOM) of the carrier. The Handling Company confirms that has received a copy of the Ground Operations Manual.

Service Delivery Standards may not compromise safety and security procedures.

Signed the  06-jul.-2021 | 10:06:11 AM BST

Barcelona
at ..............................

for and on behalf of British Airways Plc

.............................. *Patricia Cortada Fontova*

By: Patricia Cortada Fontova

Title: Head of Ground Handling

Signed the  03-Jul-2021 | 10:58:21 AM PDT

Orlando
at ..............................

for and on behalf of Ground Services International, Inc dba Dnata

.............................. *David Barker*

By: John David Barker

Title: CEO

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

**Appendix 2** to Annex B 1.1 of the IATA standard Ground Handling Agreement between British Airways Plc and Ground Service International, Inc, dba Dnata valid as from 1st February 2021 for the location Chicago O'Hare International Airport (ORD).

In accordance with Sub-Paragraph 1.2, the following rates apply:

| Prices USD ($) | Ramp Handling & Secure Cabin Clean Services (Per Turn) | | |
|---|---|---|---|
| **Aircraft Type** (All variants) | **Ramp & Secure Cabin Clean Rate (Per Turn)** | **Cargo Linehaul (Per Turn)** | **RON (Per Turn)** (If Applicable) |
| **B787 / B777 / A350** | **$2320.00** | **$400.00** | **$700.00** |
| **A380** | **$2950.00** | **$400.00** | **$700.00** |

In accordance with Sub-Paragraph 2.1, the additional charges apply:

| Sub-section | Description of Service | Per (Unit) | Rate USD ($) |
|---|---|---|---|
| 3.4.1(a)(c)(1) | Ground Power Unit | Per Hour | $75.00 |
| 3.4.1(a)(c)(3) | Aircraft Cooling | Per Hour | $75.00 |
| 3.4.1(a)(c)(4) | Aircraft Heating | Per Hour | $75.00 |
| 3.4.1(a)(c)(5) | Air Start Unit | Per Start | $125.00 |
| 3.6.1(a, c)(1) | Passenger Stairs | Per Hour | $95.00 |
| 3.8.1 (a)(1) | Additional Pushback (1 included per turn) | Per Push | $75.00 |
| 3.8.1 (a)(2) | Aircraft Tow | Per One Way | $175.00 |
| 3.11.1 (a)(1) | Additional Lav Service (1 included per turn) | Per Event | $75.00 |
| 3.12.1(a)(1,2) | Additional Water Service (1 included per turn) | Per Event | $75.00 |
| | Agent – Off Airport Security Escort of Screened Cargo - ST | Per Hour | $25.60 |
| | Agent – Off Airport Security Escort of Screened Cargo - OT | Per Hour | $36.00 |
| Cargo Only Flights | Ramp Handling w/ reduced secure clean | Per Turn | $2000.00 |
| Cargo Only Flights | Ramp Handling w/ reduced secure clean – RON (If applicable, will be charged in addition to cargo handling rate) | Per RON | $550.00 |
| Cargo Only Flights | Offload of Cabin Cargo (On Request) (If applicable, will be charged in addition to cargo handling rate) | Per Turn | $1950.00 |
| Cargo Only Flights | Flight Coordination & Jet Bridge Operation (On Request) | Per Turn | $275.00 |
| Additional Manpower | Supervisor - ST | Per Hour | $33.60 |
| Additional Manpower | Supervisor - OT | Per Hour | $47.25 |
| Additional Manpower | Ramp Agent - ST | Per Hour | $25.60 |
| Additional Manpower | Ramp Agent - OT | Per Hour | $36.00 |
| Additional Manpower | Cleaning Agent - ST | Per Hour | $22.50 |
| Additional Manpower | Cleaning Agent - OT | Per Hour | $33.75 |

In accordance with Sub-Paragraph 10.2, the following apply:

| SERVICE | SUBCONTRACTOR |
|---|---|
| 3.10 Secure Cabin Cleaning | Scrub LLC |

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

**Appendix 3** to Annex B 1.1 of the IATA standard Ground Handling Agreement between British Airways Plc and Ground Service International, Inc, dba Dnata valid as from 1st February 2021 for the location Chicago O'Hare International Airport (ORD).

**Change Order**

**Number:**

**Agreement subject to change:** IATA SGHA Annex B1.1 for Location ORD between British Airways Plc and Ground Service International, Inc, dba Dnata valid as from 1st February 2021.

**Supplier:** Ground Service International, Inc, dba Dnata

| | |
|---|---|
| **1** | **Description of Change** |
| **2** | **Origin and Reason** |
| **3** | **Effective Date of Change** |
| **4** | **Effect on Charges** |
| **5** | **Effect on Services/ Service Levels** |

Signed by )  ................................................................
duly authorised for and on behalf of )
**British Airways Plc**

)  ................................................................
Date )

Countersigned by )  ................................................................
duly authorised for and on behalf of )
**British Airways Plc**

)  ................................................................
Date )

Signed by )  ................................................................
duly authorised for and on behalf of )
**Ground Service International, Inc, dba Dnata**

)  ................................................................
Date )
)

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

**Appendix 4** to Annex B 1.1 of the IATA standard Ground Handling Agreement between British Airways Plc and Ground Service International, Inc, dba Dnata valid as from 1st February 2021 for the location Chicago O'Hare International Airport (ORD).

# Cleaning Specification

**Long haul Turnaround Clean – British Airways**

**SGHA references**

**BLACK –** denotes standard requirements
BLUE – denotes additional duties in the event of aircraft night stop

3.10       Interior Cleaning

3.10.1    Clean
(a) flight deck, if specified, under the control of a person authorised by the Carrier (night stop only)
(b) passenger and crew compartments (other than flight deck)
(2) dispose of litter
(3) clear waste from overhead stowage's
(4) wipe tables (ensuring all stains and marks are removed)
(5) seats, seat back pockets and passenger service units
(6) floors (ensuring floor is clean of debris and carpets are vacuumed)
(7) empty refuse bins (exclusive of galley bins)
(8) surfaces in pantries, galleys (sinks, working surfaces, ovens and surrounds), toilets (wash basins, bowls, seats, mirrors and surrounds)
(9) remove, as necessary, any contamination caused by airsickness, spilled food or drink and offensive stains

3.10.3    Perform cabin dressing
(a) Blankets/duvets (remove and replace blankets/duvets)
(b) Arrange seat belts
(d) Replace headrests (if change in cabin configuration)
(e) Replace pillow covers
(f) Restock toilet items (night stop only)
(g) Replace/restock seat back pocket items (night stop only)
(h) Other cabin items as specified in Annex B (E.g. safety card, sick bag, Highlife magazine, Business Life magazine)

3.10.4    (a) Disinfect
(b) Deodorize
aircraft with
(2) materials provided by the Handling Company

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

**Appendix 4A** to Annex B 1.1 of the IATA standard Ground Handling Agreement between British Airways Plc and Ground Service International, Inc, dba Dnata valid as from 1st February 2021 for the location Chicago O'Hare International Airport (ORD).

**US Secure Clean Specifics**

**PRE-DEPARTURE SECURITY CHECKS OF AIRCRAFT DEPARTING US AIRPORTS**

The purpose of pre-departure checks is to ensure, within the limitations of the checks, that no prohibited articles or unauthorised people are on board the aircraft

**Scope:**
Pre-departure security checks are required on all BA aircraft at all originating stations in USA

A thorough physical search of the empty interior of the aircraft must be conducted. This should include:

- overhead bins
- closets
- lavatories
- compartments within the lavatories; which do not require special tools to open
- galleys
- trash receptacles
- storage bins
- seat backs
- seat pockets
- under seats
- life vests
- seat cushions
- other accessible compartments in the passenger cabin which do not require special tools to open.

The following paragraphs detail the depth of the required checks.

a) Floor area
The floor area underneath the seats must be thoroughly checked to ensure that nothing is present.

b) Seat areas
A check of the seats and seat back storage is required. This is to include ensuring that no items are concealed, by lifting seat cushions, where possible and examining the contents of seat back pockets. Where it is not possible to lift the seat cushion, a thorough pat down of the cushion must be carried out.

Life vest packages must be inspected using RFID scanners and physical inspection to clear scanning exceptions. This inspection may include physically removing each life vest package from the holder and inspecting for signs of tampering. If the life vest package is properly sealed and the seal is intact, no further check of the package is required. Once the life vest package is removed, the holder area should be visually inspected. Any life vest package or holder that appears to have been tampered with must be reported to Engineering and station management

c) Crew seats and crew rest areas, including bunks
Crew seats and rest areas must be checked in the same way as passenger seats. Careful attention is to be paid to mattresses and bedding in the bunk areas. Wardrobes and stowage's are to be checked visually.

d)    Overhead bins and compartments;
      All overhead bins and compartments must be opened, and a visual check made of each
      compartment. If necessary, and where fitted, seat steps should be used to ensure the complete base of
      the bin is checked. Miscellaneous items in bins such as a single blanket, a magazine or newspaper,
      spare headset covers etc. are to be moved to ensure they are not hiding anything. Heavy or bulky items
      of equipment stowed in overhead bins need not be physically moved to facilitate a check, although the
      best possible visual check is to be made in such circumstances, by running hands around the edges
      and using mirrors if necessary.

e)    Storage cupboards and wardrobes;
      Storage cupboards, wardrobes and any other miscellaneous space to which passengers could
      legitimately gain access are to be visually inspected in the same way as overhead stowage areas. This
      includes seat storage compartments in First and Club World cabins.

f)    Toilets;
      Checks of toilets must include a visual check for evidence of tampering, graffiti on walls or mirrors etc.
      and an internal check of cupboards and stowage space. Waste bin and water heating access panels are
      to be removed and the compartments checked.

**Certification:**
The contractor must complete a signed British Airways accountable document, for each aircraft, certifying that
the security check has been carried out to the required standard and given to the BA ground staff. A copy of this
document is to be retained by the contractor for a rolling period of 6 months and made available to British
Airways on request.

**Personnel Recruitment:**
The contractor is to nominate a specific person or persons to be responsible for security. Before
employing staff on aircraft checking duties, the contractors is to ensure that they have been recruited in and
trained in accordance with British Airways procedures and have undergone appropriate background and are in
position of an airport ID.

**Personnel Training:**
All training is to be carried out by a fully approved Instructor who is notified by the contractor to British Airways
together with supporting evidence of such approval. All training programmes are to be approved by the TSA/BA.
Training may be carried out in-house or sub-contracted to another agency providing the approval criteria are
met.

Before commencing duties of aircraft checking, the contractor is to ensure that all personnel have
received appropriate training in:

i)     Individual security responsibilities inc: reporting of incidents/escalation to discovery of
       suspicious articles;
ii)    Confidentiality of security information
iii)   Must be trained to proficiency on all security functions for which they have responsibility
       including being familiar with BA and third party customer aircraft type and the methodology of
       checking of aircraft.

Training records must be maintained for all staff. They are to be signed by both trainer and trainee and available
for review by the regulator, airline and those with a need to know.

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

**Performance Monitoring:**

Performance monitoring in the form of tests, inspections and audits is to be carried out by the following organisations

a)      BA staff on station
b)      The authorised contractor.
c)      BA Security Services

The contractor is to take such steps as may be deemed necessary to ensure remedial action. This is to include re-training or disciplinary measures if appropriate and may extend to British Airways refusing an individual access to its aircraft.

In the event of an SLA non-compliance, penalties will be raised against the ground handling agent where cleaning is included within contract. In the event this service is contracted to another supplier by British Airways, a penalty will apply to both companies; the cleaning company responsible for the duty and the ground handler responsible for the management and controlling of the turnaround.

Additionally, in the event of any fine imposed on British Airways by the Transportation Security Administration (TSA) or any other authority due to a failing within the remit of the supplier this will be recharged accordingly by British Airways to the supplier.

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

**Appendix 5** to Annex B 1.1 of the IATA standard Ground Handling Agreement between British Airways Plc and Ground Service International, Inc, dba Dnata valid as from 1st February 2021 for the location Chicago O'Hare International Airport (ORD).

# IAG Cargo
# Line Haul Service Level Agreement

**Definition:**
The transport of Cargo on specialized equipment between the cargo warehouse and aircraft side and vice versa.

**Scope:**
The line haul operator (Handling Company) shall handle in accordance with IATA Unit Load Devices Regulations Edition 9 Section 9 - Handling

**Equipment:**
All freight shall be moved on approved airport transportation equipment, with such equipment being in sound working condition including rollers, locks and casters. Prior to conveyance the line haul operator will check all ULD's are 'locked (secured), on the transport vehicle.  All empty equipment should be prepared for transport in a safe and secure manner - ULD curtains, side panels and pallets are all in locked or tie-down condition "ready for carriage".

**Movement:**

- Underline: On Airport
  ULDs will be transported on dollies provided by the line-haul or ramp vendor (Handling Company) as stated in the contract.  Baggage carts can be used for special movements when applicable.  The line-haul operator needs to ensure that all units are locked in place before movement.

- Off-Airport operations
  Off-airport' transport shall be operated with open flat-bed trailers or enclosed, locked and sealed roller-bed trailers for movement from/to the warehouse.  An escort is required on all export moves from the warehouse to the AOA.  Enclosed, locked, sealed roller-bed trucks can be used in place of open-flat bed trailers if this is accepted on the AOA. Enclosed, locked and sealed roller-bed trailers should be used for movements of live animals that cannot be transported in vans and shipments requiring protection from the weather.

**General:**

Prior to loading onto an aircraft all irregularities need to be communicated to the cargo GHA and corrected to ensure the safety and security of the aircraft.

Loose freight shall **only** be transported in enclosed carts, dollies, vans or AKEs for bulk loading.
Palletised AVI for export needs to be pulled last from the warehouse to the aircraft. Palletised AVI on imports needs to pulled first from the aircraft to the warehouse.

It is the responsibility of the respective handling agent(s) to report and/or notate any discrepancies, damage or spillage observed prior to any sign-off.

In the event of transportation accidents or breakdowns it is the responsibility of the Line Haul operator to report such events to IAG Cargo immediately.

On airport dolly trains shall not exceed 4 units per pull or such unit limit as the local airport authority mandates.

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

## Availability and Delivery Times

The Line haul operator (Handling Company) will provide equipment and manpower to meet the following timescales for on airport facilities.

| Export Availability | On Airport Operations | Off Airport Operations |
|---|---|---|
| General Cargo | -90 from STD | -120 from STD |
| Prioritize XPS  / Critical / AVI | -75 from STD | -90 from STD |
| Courier | -75 from STD | -90 from STD |
| Mail | -90 from STD | -90 from STD |
| Constant Climate | -75 from STD | -90 from STD |
| Export staged for inspection | -120 to -90 from STD | -120 to -90 from STD |
| First pull | -90 from STD | -120 from STD |
| Last pull | -75 from STD | -90 from STD |
| All export airside | -60 from STD | -60 from STD |

| Import Availability | On Airport Operations | Off Airport Operations |
|---|---|---|
| General Cargo | +90 from ATA | +90 from ATA |
| Prioritize XPS  / Critical / AVI | +60 from ATA | +60 from ATA |
| Courier | +60 from ATA | +60 from ATA |
| Mail | +120 from ATA direct to USPS* (except JFK – mail to building 77) | +120 from ATA |
| Constant Climate | +60 from ATA | +60 from ATA |

*Handling Company must provide a delivery receipt to verify delivery times.

## Personnel

Personnel assigned such Line Haul duties shall be licensed, permitted and/or authorized operators of such transportation equipment. Agents shall hold all current, valid authorizations, including but not limited to, appropriate State Driver/Operator License for applicable vehicle(s), Airport Authority ID, including all necessary access authorizations, for the performance of this function.

**This specification is acknowledged to be those activities as referred in the attached Annex 'B' per the functions as provided in AHM 810 (Version 2013) Annex A Sections: 3.6.3; 3.6.5 ; 3.6.6 a, b, c.**

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

**Appendix 6** to Annex B 1.1 of the IATA standard Ground Handling Agreement between British Airways Plc and Ground Service International, Inc, dba Dnata valid as from 1st February 2021 for the location Chicago O'Hare International Airport (ORD).

## INTERNATIONAL AIRLINE GROUP (IAG) CORPORATE ENVIRONMENTAL POLICY

Aviation has a significant environmental impact upon local communities around airports and on the global climate.

IAG aims to reduce and limit its environmental impact where possible, and we have embedded environmental objectives and targets into our corporate business plan to achieve this. Our vision is that when our customers fly, they are confident that the IAG airlines and their supply chains are acting responsibly for the world in which we live.

Our strategy is to encourage our suppliers and customers to be committed to corporate responsibility and help us build a sustainable business for the future.

IAG is committed to net zero $CO_2$ emissions by 2050, with additional interim targets along this journey. We measure and mitigate our impact on the environment, both on the ground and in the air, while responding to the demand for passenger and cargo air transport in the 21st century.

We expect our suppliers to adopt procedures and practices to minimise their impact on the environment, and to work collaboratively with IAG to help meet our environmental sustainability goals particularly in relation to climate, waste and noise.

Handling companies are expected to comply with all appropriate local, national and international environmental legislation as a minimum requirement.

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

**Appendix 7** to Annex B 1.1 of the IATA standard Ground Handling Agreement between British Airways Plc and Ground Service International, Inc, dba Dnata valid as from 1st February 2021 for the location Chicago O'Hare International Airport (ORD).

### Description of Personal Data Processing

The data processing activities carried out by the Handling Company under this Agreement may be described as follows:

1. **Subject matter**

   Processing of Carrier's personnel and passengers' personal data by the Handling Company when providing Services in accordance with the provisions of the Agreement.

2. **Duration**

   In accordance with the terms and provisions of the Agreement.

3. **Nature and purpose**

   The transfer and/or disclosure of the personal data by the Carrier to the Handling Company is necessary for the proper provision of Services as specified in the Agreement (Representation, Administration and Supervision; Passenger Services; Ramp Services; Load Control and Flight Operations; Support Services; Security).

4. **Data categories**

   Passenger booking, reservations, baggage handling services and departure control data.

5. **Data subjects**

   Carrier's personnel and passengers.

**Appendix 8** to Annex B 1.1 of the IATA standard Ground Handling Agreement between British Airways Plc and Ground Service International, Inc, dba Dnata valid as from 1st February 2021 for the location Chicago O'Hare International Airport (ORD).



EUROPEAN COMMISSION
DIRECTORATE-GENERAL JUSTICE

Directorate C: Fundamental rights and Union citizenship
**Unit C.3: Data protection**

_____

### Commission Decision C(2010)593
### Standard Contractual Clauses (processors)

For the purposes of Article 26(2) of Directive 95/46/EC for the transfer of personal data to processors established in third countries which do not ensure an adequate level of data protection

Name of the data exporting organisation:

**British Airways Plc**

**PO Box 365**

**Harmondsworth, UB7 0GB, UK**

(the data **exporter**)

And

**Ground Service International Inc, dba Dnata**

**12124 High Tech Ave STE 200**

**Orlando, FL 32817**

Other information needed to identify the organisation:

**Ground Service International Inc, dba Dnata**

(the data **importer**)

each a "party"; together "the parties",

HAVE AGREED on the following Contractual Clauses (the Clauses) in order to adduce adequate safeguards with respect to the protection of privacy and fundamental rights and freedoms of individuals for the transfer by the data exporter to the data importer of the personal data specified in Appendix 1.

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

*Clause 1*

**Definitions**

For the purposes of the Clauses:

(a)  *'personal data', 'special categories of data', 'process/processing', 'controller', 'processor', 'data subject'* and *'supervisory authority'* shall have the same meaning as in Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data[1];

(b)  '*the data exporter'* means the controller who transfers the personal data;

(c)  *'the data importer'* means the processor who agrees to receive from the data exporter personal data intended for processing on his behalf after the transfer in accordance with his instructions and the terms of the Clauses and who is not subject to a third country's system ensuring adequate protection within the meaning of Article 25(1) of Directive 95/46/EC;

(d)  *'the subprocessor'* means any processor engaged by the data importer or by any other subprocessor of the data importer who agrees to receive from the data importer or from any other subprocessor of the data importer personal data exclusively intended for processing activities to be carried out on behalf of the data exporter after the transfer in accordance with his instructions, the terms of the Clauses and the terms of the written subcontract;

(e)  '*the applicable data protection law'* means the legislation protecting the fundamental rights and freedoms of individuals and, in particular, their right to privacy with respect to the processing of personal data applicable to a data controller in the Member State in which the data exporter is established;

(f)  *'technical and organisational security measures'* means those measures aimed at protecting personal data against accidental or unlawful destruction or accidental loss, alteration, unauthorised disclosure or access, in particular where the processing involves the transmission of data over a network, and against all other unlawful forms of processing.

*Clause 2*

**Details of the transfer**

The details of the transfer and in particular the special categories of personal data where applicable are specified in Appendix 1 which forms an integral part of the Clauses.

*Clause 3*

**Third-party beneficiary clause**

1.  The data subject can enforce against the data exporter this Clause, Clause 4(b) to (i), Clause 5(a) to (e), and (g) to (j), Clause 6(1) and (2), Clause 7, Clause 8(2), and Clauses 9 to 12 as third-party beneficiary.

2.  The data subject can enforce against the data importer this Clause, Clause 5(a) to (e) and (g), Clause 6, Clause 7, Clause 8(2), and Clauses 9 to 12, in cases where the data exporter has factually disappeared or has ceased to exist in law unless any successor entity has assumed the entire legal obligations of the data exporter by contract or by operation of law, as a result of which it takes on the rights and obligations of the data exporter, in which case the data subject can enforce them against such entity.

3.  The data subject can enforce against the subprocessor this Clause, Clause 5(a) to (e) and (g), Clause 6, Clause 7, Clause 8(2), and Clauses 9 to 12, in cases where both the data exporter and the data importer have factually disappeared or ceased to exist in law or have become insolvent, unless any successor entity has assumed the entire legal obligations of the data exporter by contract or by operation of law as a result of

---

[1]    Parties may reproduce definitions and meanings contained in Directive 95/46/EC within this Clause if they considered it better for the contract to stand alone.

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

which it takes on the rights and obligations of the data exporter, in which case the data subject can enforce them against such entity. Such third-party liability of the subprocessor shall be limited to its own processing operations under the Clauses.

4.      The parties do not object to a data subject being represented by an association or other body if the data subject so expressly wishes and if permitted by national law.

*Clause 4*

**Obligations of the data exporter**

The data exporter agrees and warrants:

(a)     that the processing, including the transfer itself, of the personal data has been and will continue to be carried out in accordance with the relevant provisions of the applicable data protection law (and, where applicable, has been notified to the relevant authorities of the Member State where the data exporter is established) and does not violate the relevant provisions of that State;

(b)     that it has instructed and throughout the duration of the personal data processing services will instruct the data importer to process the personal data transferred only on the data exporter's behalf and in accordance with the applicable data protection law and the Clauses;

(c)     that the data importer will provide sufficient guarantees in respect of the technical and organisational security measures specified in Appendix 2 to this contract;

(d)     that after assessment of the requirements of the applicable data protection law, the security measures are appropriate to protect personal data against accidental or unlawful destruction or accidental loss, alteration, unauthorised disclosure or access, in particular where the processing involves the transmission of data over a network, and against all other unlawful forms of processing, and that these measures ensure a level of security appropriate to the risks presented by the processing and the nature of the data to be protected having regard to the state of the art and the cost of their implementation;

(e)     that it will ensure compliance with the security measures;

(f)     that, if the transfer involves special categories of data, the data subject has been informed or will be informed before, or as soon as possible after, the transfer that its data could be transmitted to a third country not providing adequate protection within the meaning of Directive 95/46/EC;

(g)     to forward any notification received from the data importer or any subprocessor pursuant to Clause 5(b) and Clause 8(3) to the data protection supervisory authority if the data exporter decides to continue the transfer or to lift the suspension;

(h)     to make available to the data subjects upon request a copy of the Clauses, with the exception of Appendix 2, and a summary description of the security measures, as well as a copy of any contract for subprocessing services which has to be made in accordance with the Clauses, unless the Clauses or the contract contain commercial information, in which case it may remove such commercial information;

(i)     that, in the event of subprocessing, the processing activity is carried out in accordance with Clause 11 by a subprocessor providing at least the same level of protection for the personal data and the rights of data subject as the data importer under the Clauses; and

(j)     that it will ensure compliance with Clause 4(a) to (i).

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

*Clause 5*

***Obligations of the data importer[2]***

The data importer agrees and warrants:

(a) to process the personal data only on behalf of the data exporter and in compliance with its instructions and the Clauses; if it cannot provide such compliance for whatever reasons, it agrees to inform promptly the data exporter of its inability to comply, in which case the data exporter is entitled to suspend the transfer of data and/or terminate the contract;

(b) that it has no reason to believe that the legislation applicable to it prevents it from fulfilling the instructions received from the data exporter and its obligations under the contract and that in the event of a change in this legislation which is likely to have a substantial adverse effect on the warranties and obligations provided by the Clauses, it will promptly notify the change to the data exporter as soon as it is aware, in which case the data exporter is entitled to suspend the transfer of data and/or terminate the contract;

(c) that it has implemented the technical and organisational security measures specified in Appendix 2 before processing the personal data transferred;

(d) that it will promptly notify the data exporter about:

(i) any legally binding request for disclosure of the personal data by a law enforcement authority unless otherwise prohibited, such as a prohibition under criminal law to preserve the confidentiality of a law enforcement investigation,

(ii) any accidental or unauthorised access, and

(iii) any request received directly from the data subjects without responding to that request, unless it has been otherwise authorised to do so;

(e) to deal promptly and properly with all inquiries from the data exporter relating to its processing of the personal data subject to the transfer and to abide by the advice of the supervisory authority with regard to the processing of the data transferred;

(f) at the request of the data exporter to submit its data processing facilities for audit of the processing activities covered by the Clauses which shall be carried out by the data exporter or an inspection body composed of independent members and in possession of the required professional qualifications bound by a duty of confidentiality, selected by the data exporter, where applicable, in agreement with the supervisory authority;

(g) to make available to the data subject upon request a copy of the Clauses, or any existing contract for subprocessing, unless the Clauses or contract contain commercial information, in which case it may remove such commercial information, with the exception of Appendix 2 which shall be replaced by a summary description of the security measures in those cases where the data subject is unable to obtain a copy from the data exporter;

(h) that, in the event of subprocessing, it has previously informed the data exporter and obtained its prior written consent;

(i) that the processing services by the subprocessor will be carried out in accordance with Clause 11;

(j) to send promptly a copy of any subprocessor agreement it concludes under the Clauses to the data exporter.

---

[2] Mandatory requirements of the national legislation applicable to the data importer which do not go beyond what is necessary in a democratic society on the basis of one of the interests listed in Article 13(1) of Directive 95/46/EC, that is, if they constitute a necessary measure to safeguard national security, defense, public security, the prevention, investigation, detection and prosecution of criminal offences or of breaches of ethics for the regulated professions, an important economic or financial interest of the State or the protection of the data subject or the rights and freedoms of others, are not in contradiction with the standard contractual clauses. Some examples of such mandatory requirements which do not go beyond what is necessary in a democratic society are, *inter alia,* internationally recognised sanctions, tax-reporting requirements or anti-money-laundering reporting requirements.

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

*Clause 6*

**Liability**

1.  The parties agree that any data subject, who has suffered damage as a result of any breach of the obligations referred to in Clause 3 or in Clause 11 by any party or subprocessor is entitled to receive compensation from the data exporter for the damage suffered.

2.  If a data subject is not able to bring a claim for compensation in accordance with paragraph 1 against the data exporter, arising out of a breach by the data importer or his subprocessor of any of their obligations referred to in Clause 3 or in Clause 11, because the data exporter has factually disappeared or ceased to exist in law or has become insolvent, the data importer agrees that the data subject may issue a claim against the data importer as if it were the data exporter, unless any successor entity has assumed the entire legal obligations of the data exporter by contract of by operation of law, in which case the data subject can enforce its rights against such entity.

    The data importer may not rely on a breach by a subprocessor of its obligations in order to avoid its own liabilities.

3.  If a data subject is not able to bring a claim against the data exporter or the data importer referred to in paragraphs 1 and 2, arising out of a breach by the subprocessor of any of their obligations referred to in Clause 3 or in Clause 11 because both the data exporter and the data importer have factually disappeared or ceased to exist in law or have become insolvent, the subprocessor agrees that the data subject may issue a claim against the data subprocessor with regard to its own processing operations under the Clauses as if it were the data exporter or the data importer, unless any successor entity has assumed the entire legal obligations of the data exporter or data importer by contract or by operation of law, in which case the data subject can enforce its rights against such entity. The liability of the subprocessor shall be limited to its own processing operations under the Clauses.

*Clause 7*

**Mediation and jurisdiction**

1.  The data importer agrees that if the data subject invokes against it third-party beneficiary rights and/or claims compensation for damages under the Clauses, the data importer will accept the decision of the data subject:

    (a)  to refer the dispute to mediation, by an independent person or, where applicable, by the supervisory authority;

    (b)  to refer the dispute to the courts in the Member State in which the data exporter is established.

2.  The parties agree that the choice made by the data subject will not prejudice its substantive or procedural rights to seek remedies in accordance with other provisions of national or international law.

*Clause 8*

**Cooperation with supervisory authorities**

1.  The data exporter agrees to deposit a copy of this contract with the supervisory authority if it so requests or if such deposit is required under the applicable data protection law.

2.  The parties agree that the supervisory authority has the right to conduct an audit of the data importer, and of any subprocessor, which has the same scope and is subject to the same conditions as would apply to an audit of the data exporter under the applicable data protection law.

3.  The data importer shall promptly inform the data exporter about the existence of legislation applicable to it or any subprocessor preventing the conduct of an audit of the data importer, or any subprocessor, pursuant to paragraph 2. In such a case the data exporter shall be entitled to take the measures foreseen in Clause 5 (b).

Standard Ground Handling Agreement
Simplified Procedure
Annex B1.0 - Location(s), Agreed Services and Charges

*Clause 9*

**Governing Law**

The Clauses shall be governed by the law of England.

*Clause 10*

**Variation of the contract**

The parties undertake not to vary or modify the Clauses. This does not preclude the parties from adding clauses on business related issues where required as long as they do not contradict the Clause.

Clause 11

**Subprocessing**

1.  The data importer shall not subcontract any of its processing operations performed on behalf of the data exporter under the Clauses without the prior written consent of the data exporter. Where the data importer subcontracts its obligations under the Clauses, with the consent of the data exporter, it shall do so only by way of a written agreement with the subprocessor which imposes the same obligations on the subprocessor as are imposed on the data importer under the Clauses[3]. Where the subprocessor fails to fulfil its data protection obligations under such agreement the data importer shall remain fully liable to the data exporter for the performance of the subprocessor's obligations under such agreement.

2.  The prior written contract between the data importer and the subprocessor shall also provide for a third-party beneficiary clause as laid down in Clause 3 for cases where the data subject is not able to bring the claim for compensation referred to in paragraph 1 of Clause 6 against the data exporter or the data importer because they have factually disappeared or have ceased to exist in law or have become insolvent and no successor entity has assumed the entire legal obligations of the data exporter or data importer by contract or by operation of law. Such third-party liability of the subprocessor shall be limited to its own processing operations under the Clauses.

3.  The provisions relating to data protection aspects for subprocessing of the contract referred to in paragraph 1 shall be governed by the law of the Member State in which the data exporter is established.

4.  The data exporter shall keep a list of subprocessing agreements concluded under the Clauses and notified by the data importer pursuant to Clause 5 (j), which shall be updated at least once a year. The list shall be available to the data exporter's data protection supervisory authority.

*Clause 12*

**Obligation after the termination of personal data processing services**

1.  The parties agree that on the termination of the provision of data processing services, the data importer and the subprocessor shall, at the choice of the data exporter, return all the personal data transferred and the copies thereof to the data exporter or shall destroy all the personal data and certify to the data exporter that it has done so, unless legislation imposed upon the data importer prevents it from returning or destroying all or part of the personal data transferred. In that case, the data importer warrants that it will guarantee the confidentiality of the personal data transferred and will not actively process the personal data transferred anymore.

2.  The data importer and the subprocessor warrant that upon request of the data exporter and/or of the supervisory authority, it will submit its data processing facilities for an audit of the measures referred to in paragraph 1.

---

[3]    This requirement may be satisfied by the Subprocessor co-signing the contract entered into between the data exporter and the data importer under this Decision.

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

**On behalf of the data exporter:**
Name: Patricia Cortada Fontova
Position: Head of Ground Handling
Address: P.O. Box 365, Waterside, Harmondsworth, UB7 0GB, United Kingdom

Other information necessary in order for the contract to be binding (if any):

Signature……………………………………………………

(stamp of organisation)

**On behalf of the data importer:**
Name: John David Barker
Position: CEO
Address: 12124 High Tech Ave STE 200, Orlando, FL 32817

Other information necessary in order for the contract to be binding (if any):

Signature…………………………………………………….

(stamp of organisation)

DocuSign Envelope ID: CFEC8665-67FD-49A8-A969-346CDC29C70D

**Standard Ground Handling Agreement**
**Simplified Procedure**
Annex B1.0 - Location(s), Agreed Services and Charges

## APPENDIX 1 TO THE STANDARD CONTRACTUAL CLAUSES

This Appendix forms part of the Clauses and must be completed and signed by the parties.
The Member States may complete or specify, according to their national procedures, any additional necessary information to be contained in this Appendix.

**Data exporter**
The data exporter is (please specify briefly your activities relevant to the transfer):  British Airways Plc, International Air Carrier

**Data importer**
The data importer is (please specify briefly activities relevant to the transfer): Ground Service International, Inc, dba Dnata, ground handling company.

IMPORTER provides EXPORTER with application to help EXPORTER process airline passeger embarking and disembarking aircraft.

**Data subjects**
The personal data transferred concern the following categories of data subjects (please specify):

Passengers and staff members of the Data Exporter.

**Categories of data**
The personal data transferred concern the following categories of data (please specify):

Personal data (name, surname), and other flight booking information (flight number, and, for certain passengers information about disability).

**Special categories of data (if appropriate)**
The personal data transferred concern the following special categories of data (please specify):

**Processing operations**
The personal data transferred will be subject to the following basic processing activities (please specify):

Operations on personal data such as collecting, recording, storing, processing, providing access to and deleting information.

DATA EXPORTER
Name: Patricia Cortada Fontova
Position: Head of Ground Handling
IAG Carrier: British Airways Plc
Address: P.O. Box 365, Waterside, Harmondsworth, UB7 0GB, United Kingdom
Authorised Signature … … … … …

DATA IMPORTER
Name: John David Barker
Position: CEO
Handling Company: Ground Service International, Inc, dba Dnata
Address: 12124 High Tech Ave STE 200, Orlando, FL 32817
Authorised Signature … … … … …

## APPENDIX 2 TO THE STANDARD CONTRACTUAL CLAUSES

This Appendix forms part of the Clauses and must be completed and signed by the parties.
**Description of the technical and organisational security measures implemented by the data importer in accordance with Clauses 4(d) and 5(c) (or document/legislation attached).**